UNITED STATES of America, Plaintiff-Appellee,

v.

David T. DELLINGER, et al., Defendants-Appellants.

No. 80–2229.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1981.

Decided Aug. 19, 1981.

Morton Stavis, William M. Kunstler, Center for Constitutional Rights, New York City, for defendants-appellants.

David D. Buvinger, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before SPRECHER, Circuit Judge, GIBSON,* Senior Circuit Judge, and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

David T. Dellinger, Abbot H. Hoffman, William K. Kunstler and Jerry C. Rubin appeal from the district court's denial of

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

1. This court subsequently reversed the convictions on the substantive charges against the five defendants and remanded for retrial. *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). The government thereafter elected to dismiss the substantive charges.

their motion to vacate and expunge the judgments of conviction for criminal contempt entered against them by the district court on December 6, 1973, in the case of *In re Dellinger*, 370 F.Supp. 1304 (N.D.Ill. 1973), *aff'd*, 502 F.2d 813 (7th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). For the reasons stated below, we affirm.

I.

The criminal contempt convictions which the defendants seek to set aside arose directly from their conduct during the celebrated 1969–70 "Chicago Seven" conspiracy trial ("1969 conspiracy trial"), at which five defendants were found guilty of violating the Anti-Riot Act of 1968, 18 U.S.C. § 2101 (1976), in connection with their participation in events surrounding the August 1968 Democratic National Convention in Chicago, Illinois. *United States v. Dellinger*, 68 CR 180 (N.D.Ill.1969).[1] Dellinger, Hoffman and Rubin were defendants in that case, and Kunstler was one of the two trial counsel for the defendants. After the Anti-Riot Act charges had been submitted to the jury, the presiding judge, the Honorable Julius J. Hoffman of the United States District Court for the Northern District of Illinois, summarily convicted all seven defendants and both trial counsel on a total of 159 specifications of criminal contempt of court, in violation of 18 U.S.C. § 401(1) (1976). These contempt convictions were subsequently reversed by this court and 141 of the specifications were remanded for retrial before another judge. *In re Dellinger*, 461 F.2d 389 (7th Cir. 1972).[2]

The Chief Justice of the United States, pursuant to 28 U.S.C. § 292 (1976), then

---

2. In a companion case, this court also reversed the contempt convictions of Bobby G. Seale, an eighth defendant who had been severed and summarily held in contempt by Judge Hoffman. *United States v. Seale*, 461 F.2d 345 (7th Cir. 1972). Subsequently, the government dismissed both the substantive charges and the contempt charges against Seale.

designated the Honorable Edward T. Gignoux, District Judge of the United States District Court for the District of Maine, to hear the contempt specifications on remand. After granting the government's motion to limit the maximum sentence of any of the defendants to 177 days and to dismiss 89 of the remaining 141 specifications of contempt, the court, sitting without a jury, heard the case. *In re Dellinger*, 357 F.Supp. 949, 955 (N.D.Ill.1973). At the conclusion of the government's case-in-chief, which consisted solely of the introduction of the Anti-Riot Act trial transcript and tape recordings, the court acquitted two of the defendants and dismissed a number of the contempt specifications against the other defendants. *In re Dellinger*, 370 F.Supp. 1304, 1307 (N.D.Ill.1973). At the end of the trial, three more defendants were acquitted on all charges and judgments of acquittal were entered as to several specifications against the remaining defendants. Hoffman, Rubin and Kunstler were each then convicted on two specifications of criminal contempt and Dellinger on seven specifications, although no sentences or fines were imposed. *Id.* at 1323–34. These convictions were affirmed by this court and certiorari was denied by the United States Supreme Court. *In re Dellinger*, 502 F.2d 813 (7th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

Defendants' instant motion for vacation and expungement of the contempt convictions is supported by the affidavits of Morton Stavis, who was lead counsel for the defendants during the 1973 contempt trial, and Kunstler, who was one of the counsel for the seven defendants at the 1969 conspiracy trial and co-counsel for the non-lawyer defendants at the 1973 contempt trial. Attached to these affidavits are eleven documents which were obtained pursuant to government disclosures under the Freedom of Information Act, 5 U.S.C. § 552 (1976), and from civil discovery in an unrelated action pending in the United States District Court for the Northern District of Illinois. Nine of these documents were internal FBI memoranda; two were from files of the Chicago Police Department.

One of the FBI memoranda indicates that United States Attorney Thomas Foran requested the FBI before the 1969 conspiracy trial to monitor closely the activities of the defendants and obtain any statements they might have made "to show possible admissions, to thwart a possible attempt to seek a change of venue due to publicity, and to show possible contempt of court before, during, and after the trials by the defendants and their lawyers." A subsequent FBI memorandum states that, during trial, Foran requested the FBI to record any statements made by the defendants, as such recordings "would be invaluable to prove contempt actions" and to demonstrate (in response to a request for change of venue because of adverse publicity) that "the defendants generated their own publicity."

Another FBI memorandum suggests that Judge Hoffman had *ex parte* conversations with Foran concerning both the defendants' possible claim of adverse publicity and the possible contempt citations against the defendants.

According to another FBI memorandum, "Chief Judge William J. Campbell [of the United States District Court for the Northern District of Illinois] advised . . . in strictist [sic] confidence that Judge Hoffman based on actions of the defendants and attorneys in the courtroom may call a mistrial and send all defendants and their attorneys to jail for contempt for six months." Another FBI memorandum indicates that Chief Judge Campbell advised the FBI that a subpoena served by the defendants on the FBI would be quashed.

Three of the documents indicate that the Chicago Police and possibly the FBI had surreptitiously attended and/or surveilled several meetings of the defendants and their counsel. It appears that information obtained in this manner (including trial strategies and potential arguments on appeal) was forwarded to Assistant United States Attorney Richard Schultz, one of the prosecutors at the 1969 conspiracy trial.

Another FBI memorandum relates to a threatening letter that was allegedly signed

by "The Black Panthers" and addressed to two of the jurors. After Judge Hoffman showed this letter to one of these two jurors (who defendants believed was favorable to their position), she stated that she feared to remain on the jury. This juror was therefore replaced by one of the alternate jurors (who, defendants allege, was engaged to be married to a "patronage dispenser" of former Chicago Mayor Richard Daley). Defendants challenged the authenticity of the letter and requested that the district court order a full investigation. Judge Hoffman indicated he would do so. The memorandum from the FBI file, however, reads in part:

> [Assistant United States Attorney] Jack S. Schmetterer ... requested letter sent to Petersen family and King family be examined for latent fingerprints. He desired absolutely no other investigation or 'outside contacts' at this time. No investigation should be undertaken without contacting him or the USA Thomas Foran. Judge Hoffman concurs.

**3.** In addition to their request for an order vacating and expunging their contempt convictions, defendants also sought an order directing former United States Attorney Foran, former Assistant United States Attorney Schultz and Marlin Johnson, former Special Agent-in-Charge of the FBI's Chicago office, to show cause why they should not be held in contempt of court because of their alleged improper *ex parte* communications with District Judges Hoffman and Campbell during the 1969 conspiracy trial. Defendants further sought an order referring the conduct of District Judges Hoffman and Campbell during the 1969 trial to the Judicial Council of the Seventh Circuit. Although the district court also denied these requests for relief, defendants have appealed only from those portions of the district court's order and opinion denying their request for an order vacating and expunging their contempt convictions.

**4.** Newly discovered evidence can provide the basis for a new trial under Fed.R.Crim.P. 33, which reads:
> The court on motion of a defendant may grant a new trial to him if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground

On June 27, 1980, oral argument on defendants' motion to vacate and expunge their contempt convictions was heard before the Honorable Edward T. Gignoux, sitting by designation. The district court denied defendants' motion in all respects in an order and opinion dated August 14, 1980. This timely appeal followed.[3]

## II.

Defendants maintain that their contempt convictions should be vacated because the newly discovered evidence summarized above demonstrates the existence of judicial and prosecutorial misconduct during the 1969 conspiracy trial of such a pervasive nature "that there was no judicial proceeding from which contempt proceedings could possibly emanate."

■ Defendants' motion must be characterized as a petition for a writ of error *coram nobis*.[4] This ancient writ (together with its correlative, the writ of error *coram vobis*[5]) was early incorporated into Ameri-

> of newly discovered evidence may be made only before or within two years after final judgment.... A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period.

The district court properly held that a Rule 33 motion would be untimely in this case because it was not brought within two years of the date of judgment in the 1973 contempt trial. *See United States v. Mallah*, 427 F.Supp. 328, 331 (S.D.N.Y.), aff'd, 559 F.2d 1205 (2d Cir. 1977).

**5.** Tidd explained the distinction between these two writs as follows:
> [If the proceeding was brought in the King's Bench to set aside a judgment of that court it was called a] writ of error *coram nobis*, or *quae coram nobis resident*, so called from its being founded on the record and process, which are stated in the writ to remain in the court of the lord the king, before the king himself.... In the Common-Pleas, the record and the process being stated to remain before the king's justices, the writ of error is called a writ of error *coram vobis*, or *quae coram vobis resident*.

2 Tidd, Practice in Personal Actions 1056 (1807). With rare exception, "[t]he distinction in American practice between *coram nobis*

can practice from English common law. *See, e. g., Strode v. The Stafford Justices*, 23 F.Cas. 236 (C.C.D.Va.1810) (per Marshall, C.J.) (judgment against a defendant, who had died, set aside 14 years later). The *coram nobis* writ serves the salutory function of allowing a court to vacate its judgments "for errors of fact . . . in those cases where the errors [are] of the most fundamental character, that is, such as rendered the proceeding itself invalid." *United States v. Mayer*, 235 U.S. 55, 69, 35 S.Ct. 16, 19–20, 59 L.Ed. 129 (1914).

■ The need for the writ has been greatly reduced in modern practice because of the availability of the remedies of habeas corpus, 28 U.S.C. § 2241 *et seq.* (1976), and motion for a new trial on the basis of newly discovered evidence, Fed.R.Crim.P. 33. Habeas corpus relief is available, however, only if the petitioner is in custody, and the new trial remedy is available only within two years of the date of final judgment in the original proceedings. *See* note 4, *supra*. Since *coram nobis* review is available at any time after entry of final judgment[6] in criminal proceedings,[7] there remain cases where the writ of *coram nobis* offers a unique possibility of relief. Thus, in *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), the Court held that *coram nobis* relief was available to challenge the validity of a judgment of conviction and term of imprisonment even though the sentence had been fully served.[8] *See also Moon v. United States*, 272 F.2d 530 (D.C.Cir.1959) (*coram nobis* can for appropriate reasons be invoked to review a sentence which petitioner has not yet started to serve).

■ The scope of *coram nobis* review, however, does not encompass all errors in the original proceedings that may be discovered subsequent to judgment. As the Supreme Court recognized in its consideration of the scope of relief under 28 U.S.C. § 2255 (1976), the reasons for narrowly limiting collateral review are weighty:

> Inroads on the concept of finality tend to undermine confidence in the integrity of our procedures. Moreover, increased volume of judicial work associated with the processing of collateral attacks inevitably impairs and delays the orderly administration of justice. Because there is no limit on the time when a collateral attack may be made, evidentiary hearings are often inconclusive and retrials may be impossible if the attack is successful.

*United States v. Addonizio*, 442 U.S. 178, 184 n. 11, 99 S.Ct. 2235, 2240 n. 11, 60 L.Ed.2d 805 (1979) (citations omitted).

Thus, in affirming the availability of *coram nobis* relief in modern federal practice, the *Morgan* Court cautioned that:

> Continuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice.[9]

346 U.S. at 511, 74 S.Ct. at 252.

### III.

■ We are presented in this case with a unique claim for *coram nobis* relief. In the

---

["before us"] and *coram vobis* ["before you"] is only nominal." 7 Moore's Federal Practice ¶ 60.14 at 46 (2d ed. 1979).

6. Of course, a petitioner must demonstrate outstanding adverse legal consequences sufficient to satisfy the "case or controversy" requirement of Article III of the Constitution. *See United States v. National Plastikware Fashions, Inc.*, 368 F.2d 845 (2d Cir. 1966), *cert. denied*, 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136 (1967).

7. Rule 60(b), Fed.R.Civ.P., expressly abolished, *inter alia*, writs of *coram nobis* and *coram vobis* in civil cases.

8. The Court determined that the authority of the federal courts to grant *coram nobis* relief in appropriate cases comes from the all-writs section of the Judicial Code, which provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (1976).

9. The limitation of *coram nobis* relief to errors "of the most fundamental character," *United States v. Morgan, supra*, 346 U.S. at 512, 74 S.Ct. at 253, has been sensibly interpreted to mean, at a minimum, that such relief is not to be granted "unless it is probable that a different result would have occurred had the suppos-

main, defendants do not argue merely that the eleven documents from the FBI and Chicago Police files disclose errors of a fundamental character in the 1973 contempt judgment.[10] Instead, defendants argue that the alleged *ex parte* communications between Judge Hoffman, Judge Campbell, United States Attorney Foran and the FBI (as well as the alleged infiltrations of the defense camp by government agents) so tainted the 1969 conspiracy trial as to deprive it of its character as a judicial proceeding out of which contempt citations could emanate.

Although this novel theory is to our knowledge without precedent, we may assume without deciding that there might be circumstances so extreme that would deprive proceedings in a duly constituted federal court of their judicial character.[11] But it is enough in this case to conclude that the new evidence proffered by the defendants, together with any inferences drawn from it in favor of the defendants, is not sufficient to suggest the existence of a "non-trial." [12]

Were we to annul totally the contempt power of the district court—in the face of flagrant and disruptive misconduct—we would indeed furnish a reward of unprecedented generosity to contumacious behavior.[13] The scales of justice must be tipped more steeply than here to justify our re-

---

ed error of fact been known to the trial court." *Bateman v. United States*, 277 F.2d 65, 68 (8th Cir. 1960).

**10.** Defendants do argue that the documents suggest that Foran perjured himself at the 1973 contempt trial by falsely stating both that he had no *ex parte* communications with Judge Hoffman and that no government agency conducted surveillance of the defendants or their lawyers between March 1969 and March 1970.

As noted above, however, *coram nobis* relief is available only if the newly discovered facts disclose an error of "the most fundamental character," *United States v. Morgan, supra,* 346 U.S. at 512, 74 S.Ct. at 253, which if known would probably have caused a different verdict at the former trial. *See* note 9, *supra.*

Foran testified only as a rebuttal witness at the 1973 trial, and none of Foran's testimony which the defendants now claim was perjurious bore directly on the specific contempt charges against the defendants. We therefore find no error in the district court's conclusion in its August 12, 1980 order that

It is inconceivable that disclosure of defendants' 'newly discovered' evidence could have had any effect on the ultimate disposition of the contempt charges.

Since the 1973 contempt trial was tried before the district court, sitting without a jury, we believe this finding is entitled to considerable deference.

**11.** Such circumstances would have to be considered in light of the settled doctrine that citizens are obligated to obey even clearly invalid or erroneous judicial orders (entered by a court with proper jurisdiction). As this court stated in *United States v. Seale, supra,* 461 F.2d at 361–62:

It is well settled that the invalidity of a court order is not generally a defense in a criminal contempt proceeding alleging its disobedience.... Of course this principle applies to defeat any contention that obstruc-

tive and disruptive courtroom conduct is excused because it protests an erroneous ruling.... [I]t is clear that even an error respecting such fundamental constitutional rights [as the Sixth Amendment right to counsel] does not excuse contumacious conduct thereby. See *Walker v. City of Birmingham, supra* [388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210] (both the injunction and ordinance upon which it was based were "unquestionably" constitutionally suspect).

. . . .

The reason that the rulings of a trial judge, no matter how sincerely felt to be or in fact indefensible, cannot excuse contumacious protestation is that '[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.' *Illinois v. Allen, supra,* 397 U.S. [337] at 343, 90 S.Ct. [1057] at 1061 [25 L.Ed.2d 353]. 'Preservation of the liberties of citizens, when on trial for crimes charged against them, demands order in the courtroom. Absent such order, no trial can be fair. More important, if criminal trials cannot go on in orderly fashion, then the defendants, if unpopular or if members of minority groups, may become the victims of that monstrous substitute for trials—mob violence.' *United States v. Sacher, supra,* 182 F.2d at 454 (concurring opinion of Judge Frank). It is precisely because appellate courts sit to vindicate error that this principle is viable.

**12.** Even viewed in the light most favorable to defendants, the newly discovered evidence does not suggest circumstances of sufficient gravity to merit further investigation in an evidentiary hearing.

**13.** None of the additional misconduct suggested by the FBI and Chicago Police Department documents was known to defendants during

garding courts of law as mere street scenes or theaters in the round.[14] In the interest of justice the substantive convictions of these defendants have been reversed and their original sentences for contempt vacated.

Prosecutorial and judicial misconduct have been acknowledged and fully reflected in radical reductions and nullifications of the earlier sanctions in this proceeding. The documents submitted at this time suggest additional improprieties,[15] but we do not believe that anything shown here requires us to abrogate without condition *all* sanctions undergirding orderly judicial process.

The district court's order denying defendants' motion is therefore Affirmed.

the 1969 conspiracy trial, and, therefore, the newly alleged misconduct of the district court and the government in no way provides a justification for the defendants' contemptuous behavior.

**14.** This court and the district court on no less than seven occasions rejected the argument that the misconduct of the government and the trial judge required the dismissal of the contempt charges in the interest of justice. As this court stated in remanding the original contempt specifications for retrial:

> [I]mpropriety on the part of the trial judge cannot justify or excuse contemptuous conduct. However, judicial (or prosecutorial) provocation is to be considered by the new hearing judge in extenuation of the offense and in mitigation of any penalty to be imposed.

*In re Dellinger, supra,* 461 F.2d at 401. *See also United States v. Seale, supra,* 461 F.2d at 361–62 (quoted in note 11, *supra* ). The same argument was again considered by this court in affirming the subsequent convictions for contempt:

> Defendants contend that the conduct of the judge and prosecutors at the Anti-Riot Act trial requires dismissal for their contempt. We have twice rejected this contention in the *Seale* and *Dellinger* contempt cases. *See* 461 F.2d at 361–363, 401. Nothing in this contempt trial persuades us to alter our prior conclusion, for provocation, however shocking, is no defense to contempt.

*In re Dellinger, supra,* 502 F.2d at 817. It is significant in this regard that the district court, after reviewing the transcript and tape-recorded proceedings of the 1969 conspiracy trial, determined that "[o]n a number of occasions, the trial so completely disintegrated that it could not be said that a judicial proceeding was in progress." 370 F.Supp. at 1321. Defendants' conduct on these occasions was not punished as contempt. In at least two such instances, the district court found the defendants not guilty of contemptuous conduct because it was not established beyond a reasonable doubt that defendants' conduct caused the breakdown in the proceedings or occasioned an "actual and material obstruction of the administration of justice." *Id.* at 1311, 1312.

Each of the contempt specifications for which defendants were convicted was supported by the finding that the contemptuous conduct was intended to and did in fact cause such an actual and material obstruction. Nothing in the newly discovered documents undercuts the soundness of these conclusions.

**15.** We have little doubt that the wrongdoing suggested by the FBI documents would have required reversal of any convictions obtained in the 1969 conspiracy trial. The government's alleged acquiescence in the surveillance of private meetings of the defendants and their counsel appears particularly egregious in this regard.