**Gordon K. HIRABAYASHI, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

No. C83–122V.

United States District Court, W.D. Washington.

Feb. 10, 1986.

---

Rodney L. Kawakami, Arthur G. Barnett, Camden M. Hall, Michael Leong, Craig Kobayashi, Daniel J. Ichinaga, Benson D. Wong, Seattle, Wash., for petitioner.

Gene S. Anderson, U.S. Atty., Susan E. Barnes, Asst. U.S. Atty., Seattle, Wash., Victor D. Stone, Richard L. Edwards, At-

tys., General Litigation and Legal Advice Section, U.S. Dept. of Justice, Washington, D.C., for respondent.

## MEMORANDUM DECISION

VOORHEES, District Judge.

Petitioner has filed a petition for a writ of error *coram nobis*, seeking the vacation of his conviction in October, 1942, for failing to report on May 11 or 12, 1942, to a designated Civil Control Station in Seattle, as required by Civilian Exclusion Order No. 57, and his conviction for failing, on or about May 4, 1942, to abide by Public Proclamation No. 3, requiring him to remain within his place of residence between 8:00 p.m. and 6:00 a.m.

Petitioner seeks to have these two misdemeanor convictions set aside on the ground that the government knowingly suppressed evidence favorable to him or presented evidence which it knew, or should have known, was false in order to secure those convictions or to defend them on appeal.

Testimony at petitioner's trial or at the evidentiary hearing on his petition indicated that at the time of the acts for which petitioner was convicted, he was a twenty-four year old senior at the University of Washington. He was at that time a native-born, American citizen, having been born in Seattle, Washington, on April 23, 1918. His parents had been born in Japan but had emigrated to the United States. His father had arrived in the United States in 1907, his mother in 1914. Both of his parents were nineteen when they came to the United States. They were married in this country. Neither had ever returned to Japan. Petitioner himself had never been to Japan and had never corresponded with any Japanese in Japan. Petitioner was educated in the public schools of King County and Seattle. He had been active in the Boy Scouts and had become a Life Scout and an Assistant Scoutmaster. He was also active in the Y.M.C.A. at the University of Washington. He had been vice president of that organization and had attended Y.M.C.A. conferences in other states as a representative of the University Y.M.C.A. He had never before been arrested on any charge.

He testified at trial that his parents had taught him and his brothers and sisters that they were American citizens and how to conduct themselves as such; that he had not reported to the Civil Control Station nor remained in his residence during the curfew hours because of his honest belief that the evacuation and curfew orders were unconstitutional and violated his rights as an American citizen and that for him to obey them voluntarily would have been a waiver of his rights; that in the Boy Scouts and the Y.M.C.A. and at the University of Washington he had learned what was expected of him as an American citizen and what his rights were as an American citizen; and that he had at all times tried earnestly to conduct himself as a good American citizen.

At trial the Secretary-Manager of the University Y.M.C.A. testified that the petitioner had at all times conducted himself as a law-abiding American citizen, that he was a leader in the Y.M.C.A. and other student organizations and affairs; that he was well-respected by his fellow students; and that he bore a very fine reputation among the people of the community.

At trial there was evidence that petitioner had violated the curfew restriction on the single night of May 9, 1942.

After the issuance of Civilian Exclusion Order No. 57, which required petitioner to report on May 11 or May 12, 1942, to a designated Civilian Control Station in Seattle, he went with his attorney to the Seattle office of the F.B.I. and turned himself in. Although this is not clear on the record, petitioner must have stated to the F.B.I. that he was refusing to report to a control station. During his interview by an agent of the F.B.I. petitioner volunteered the information that for the past few nights in May he had not abided by the curfew restrictions imposed by Public Proclamation No. 3. The F.B.I. agent advised petitioner that no charges at all would be brought if he registered with the Civilian Control Station, but this, petitioner refused, as a matter of conscience, to do.

None of this testimony was challenged by the government either at petitioner's trial or during the hearing upon petitioner's application for a writ of error *coram nobis*. The government presented no evidence that petitioner was anything other than a law-abiding, native-born American citizen.

Petitioner was indicted in a two count indictment returned by a grand jury on May 28, 1942. Count I of the indictment charged that defendant had failed to report to a designated Civil Control Station on May 11 or May 12, 1942, as required by Civilian Exclusion Order No. 57, which was issued by the Military Commander of the Western Defense Command on May 10, 1942. Count II charged that on or about May 4, 1942, between 8:00 p.m. and 6:00 a.m. defendant was not within his place of residence, as required by Public Proclamation No. 3, which was issued by the Military Commander of the Western Defense Command on March 24, 1942.

Petitioner was tried on October 20, 1942, and was found by the jury to be guilty on each count. On the following day petitioner was sentenced to serve three months on each count, the two sentences to be served concurrently.

Petitioner's appeal was argued before the Supreme Court on May 10 and 11, 1943. The sentence of confinement imposed upon petitioner was affirmed by the Supreme Court on June 21, 1943. *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

In affirming the sentence imposed upon petitioner, the Supreme Court considered only the charge in the second count, the one that charged petitioner with violating the curfew restrictions of Public Proclamation No. 3.

In an opinion authored by Chief Justice Stone, the Supreme Court stated:

The conviction under the second count is without constitutional infirmity. Hence we have no occasion to review the conviction on the first count since ... the sentences on the two counts are to run concurrently and conviction on the second is sufficient to sustain the sentence. 320

U.S. 81 at 105 [63 S.Ct. at 1387], 87 L.Ed. 1774 at 1788.

In consequence, the conviction of petitioner on the first count (the failure by him to report to a Civil Control Station) has never been reviewed upon appeal. (His conviction on both counts had been appealed by him to the United States Circuit Court for the Ninth Circuit, but that court certified the entire record to the Supreme Court and did not itself act upon the appeal.)

In determining whether petitioner's convictions should be vacated, the Court has carefully considered the record of petitioner's trial, the arguments made by the government in the brief submitted by it to the Supreme Court, the reasoning of the Supreme Court in its affirmance of the sentence imposed upon petitioner, the testimony of those who were called as witnesses at the hearing upon petitioner's petition, the voluminous exhibits which were admitted into evidence at the hearing, and the arguments made by counsel for petitioner and for the government in their post-hearing briefs.

The Court will first consider the conviction of petitioner for his failure to report to a designated Civil Control Station on May 11 or May 12, 1942.

The background of Civilian Exclusion Order No. 57 is, in brief, as follows: after the attack on Pearl Harbor on December 7, 1941, President Franklin D. Roosevelt issued Executive Order 9066, on February 19, 1942. That order authorized the Secretary of War or his designees to prescribe military areas from which any or all persons might be excluded. On February 20, 1942, Secretary of War Henry Stimson delegated his authority under Executive Order 9066 to Lieutenant General John L. DeWitt, the Commanding General of the Western Defense Command.

On March 2, 1942, General DeWitt issued Public Proclamation No. 1. The proclamation divided the states of Washington, Oregon, California and Arizona into two military areas. The western portions of Washington, Oregon and California and the

southern portion of Arizona were designated as Military Area No. 1. The balance of each of those states was designated as Military Area No. 2. On March 21, 1942, the President signed Public Law No. 503, which had been enacted by Congress. That law made it a misdemeanor knowingly to disregard restrictions made applicable by a military commander to persons in a prescribed military area.

On March 24, 1942, General DeWitt issued Civilian Exclusion Order No. 1. That order affected about fifty Japanese families, residing on Bainbridge Island, Washington, and provided for their evacuation from that island one week later. Thereafter, further exclusion orders were issued from time to time for the various zones in Military Area No. 1.

The order which affected petitioner was Civilian Exclusion Order No. 57, issued by General DeWitt on May 10, 1942. That order provided that from and after May 16, 1942, all persons of Japanese ancestry were excluded from a designated geographical area (this area included petitioner's place of residence) and required a responsible member of each family and each person living alone to report on May 11 or May 12, 1942, to a designated Civil Control Station in Seattle. The instructions which were posted with the exclusion order made it plain that reporting was for the purpose of receiving further instructions and that the excluded individuals were thereafter to be sent to an Assembly Center.

Because petitioner refused to report to the Civil Control Station, he was indicted for the crime of failing to comply with Exclusion Order No. 57, and was tried, convicted and sentenced for that offense.

Petitioner's appeal was heard by the Supreme Court on May 10 and 11, 1943. Shortly before that hearing, General DeWitt transmitted to the Secretary of War and to General George C. Marshall, the Chief of Staff, printed copies of a document entitled "Final Report: Japanese Evacuation from the West Coast 1942." It included a printed letter of transmittal to the Chief of Staff, dated April 15, 1943. That letter stated in part:

"The evacuation was impelled by military necessity. The security of the Pacific Coast continues to require the exclusion of Japanese from the area now prohibited to them and will continue for the duration of the present war."

Chapter II of the report entitled "Need for Military Control and for Evacuation" contained the following statements:

"Because of the ties of race, the intense feeling of filial piety and the strong bonds of common tradition, culture and customs, this population [the Japanese population] presented a tightly-knit racial group. It included in excess of 115,000 persons deployed along the Pacific Coast.... While it was believed that some were loyal, it was known that many were not. It was impossible to establish the identity of the loyal and the disloyal with any degree of safety. It was not that there was insufficient time in which to make such a determination; it was simply a matter of facing the realities that a positive determination could not be made, that an exact separation of the 'sheep from the goats' was unfeasible."

.     .     .     .     .

"He [the Commanding General of the Western Defense Command] had no alternative but to conclude that the Japanese constituted a potentially dangerous element from the viewpoint of military security—that military necessity required their immediate evacuation to the interior."

On April 19, 1943, Edward J. Ennis sent a memorandum (Ex. 35) to Solicitor General Charles Fahy relative to the briefs to be filed with the Supreme Court on behalf of the United States in *United States v. Hirabayashi, United States v. Yasui* and *United States v. Korematsu.* Ennis was at the time the director of the Alien Enemy Control Unit of the Department of Justice and was in charge of the preparation of the briefs for the Supreme Court in those three cases. In pertinent part that memorandum read as follows:

"In my opinion minor differences of presentation of the Court's own authorities

on the legal question of the war power, due process and martial law will have little influence on their decision in view of their own familiarity with this material and their scrutiny of the applicable law. The effective area for assisting the Court is in the presentation of the factual material. In this connection the War Department has today received a printed report from General DeWitt about the Japanese evacuation and is now determining whether it is to be released so that it may be used in connection with these cases. The War Department has been requested to furnish any published materials which may be helpful. I will continue further and so far as possible to document the facts which are not in the record but which may be judicially noticed on the constitutional question."

Coincidentally, on that same date Assistant Secretary of War John J. McCloy had a telephone conversation with Colonel Karl R. Bendetsen relative to General DeWitt's Final Report, which had just been received by the War Department in Washington, D.C. Colonel Bendetsen was at the time in charge of the Wartime Civil Control Administration of the Western Defense Command. The typed transcript (Ex. 66) of that conversation reveals that Mr. McCloy was more than a little exercised because the Final Report had been printed in final form and distributed without any prior consultation by the Western Defense Command with the War Department about its contents. Mr. McCloy was particularly disturbed that General DeWitt had stated in his report that the security of the West Coast would continue to require the exclusion of the Japanese for the duration of the war.

Thereafter, on April 26, 1943, Brigadier General James W. Barnett sent a message (Ex. 67) to General DeWitt which in pertinent part was as follows:

"Bendetsen informs me he conferred on final report in Washington today. He was given oral directive to revise the report with the assistance of Capt. Hall. He made the point that he was in no position to do this since it was your report. Bendetsen told me that he could recommend the acceptance of some parts of the suggested revision but that two points went to the fundamental concept of evacuation. The principal one of these was that loyalty could not be determined and for that reason mass evacuation was ordered. He requested instructions. I told him it was your report and that the War Department could not tell you what to say. He had made that point and said that the instructions he received were to make a draft of the proposed revision for presentation to you for acceptance or revision. If you have additional instructions I will transmit them to Bendetsen by telephone."

On April 27, 1943, General DeWitt responded to the message from Brigadier General Barnett with the following message (Ex. 68):

"My report as signed and submitted to Chief of Staff will not be changed in any respect whatsoever either in substance or form and I will not repeat not consent to any repeat any revision made over my signature. Higher authority may of course prepare and release whatsoever they so desire as views of that authority but statements in my signed report of evacuation are mine and so submitted. Submission of prepared revisions for presentation to me for acceptance or revision will accomplish nothing as final word on subject so far as I repeat I am concerned has been said."

On May 3, 1943, Colonel Bendetsen sent the following message (Ex. 70) to General DeWitt relative to conferences between himself and Assistant Secretary of War McCloy:

"Mr. McCloy stated that he strongly desired to avoid creating the impression that he had any wish to prescribe what the Commanding General should say or not say in the final report. He did say, however, that he thought it could be improved upon. Following this vein, he expressed an earnest desire to have transmitted to the CG the nature of his specific suggestions with an explanation of why he felt the making of revisions

conforming to these suggestions would result in improvement."

.    .    .    .    .

"In brief, Mr. McCloy's suggestions cover three points:

"a. In paragraph 2 of the letter of transmittal the statement appeared that the necessity for exclusion of all Japanese from the Pacific coast 'will continue for the duration of the present war.' He said he could see no objection to a statement to the effect that exclusion will be essential so long as any military necessity exists therefor, but he said no one could foresee what the situation would be a year or two hence, and therefore he felt it stultified the report to make such a statement. He drew a parallel to the fact that in the last war a formal state of war continued in existence until 1921, although hostilities had ceased on November 11, 1918.

b. "The second objection was to that portion of Chapter II which said in effect that it is absolutely impossible to determine the loyalty of Japanese no matter how much time was taken in the process. He said that he had no objection to saying that time was of the essence and that in view of the military situation and the fact *that there was no known means of making such a determination with any degree of safety* the evacuation was necessary." (Emphasis in the original.)

c.. His other comments related to certain changes in style and tone, which were orally described as designed to eliminate redundancy. These were indicated by him with blue pencil. In a number of cases he made comments on changes in tone which he believed were calculated to eliminate unnecessary pointedness with regard to certain sins of omission on the part of the Department of Justice. He said he felt this could be accomplished without in any way departing from an accurate factual account.

On May 5, 1943 General DeWitt sent the following message (Ex. 71) to Brigadier General Barnett:

"Have no desire to compromise in any way govt case in Supreme Court and do not understand how substance and form of report as submitted can have this effect. Both you and Bendetsen know my crews [views] and my attitude. Do not understand McCloy's proposal. · Report is now factual and I *solemnly* see my views and actions determined as necessary at time of evacuation weakened or undermined if report changes. I cannot conscientiously change or put into separate document proposals for future disposition of evacuees without by my own act invalidating my assigned mission and responsibilities thereunder. If time permits send Bendetsen by air to Anchorage reporting to me from there so he will know where to meet me and I can be fully informed and settle the matter." (Emphasis in the original)

On May 9, 1943, Colonel Bendetsen sent the following message (Ex. 72) to Brigadier General Barnett:

"General DeWitt directs that final report of evacuation be revised as indicated by Colonel Bendetsen to Major Moffitt in Major Moffitts copy of report together with style changes given to Major Moffitt orally ... You are prohibited from submitting to Assistant Secretary of War any drafts of amended report. Further the revised report will not be given to anyone until DeWitt finally approves. All copies heretofore sent to the War Department (not including inclosures) will be called in by you and you will have War Department records of receiving report destroyed inasmuch as such revision as is finally sent to War Department will have a later dated transmittal letter...."

Exhibits 73 and 74 relate to the changes in the Final Report suggested by the War Department. Fifty-five changes were listed. The proposed changes most relevant to this proceeding were these:

Page iii, paragraph 2, second sentence: Eliminate the words "and will continue for the duration of the present war."

Page iii, paragraph 2, end of the second sentence: Insert "The surprise attack at Pearl Harbor by the enemy crippled a major portion of the Pacific Fleet and

exposed the West Coast to an attack which could not have been substantially impeded by defensive fleet operations. More than 120,000 persons of Japanese ancestry resided in colonies adjacent to many highly sensitive installations. Their loyalties were unknown, and time was of the essence."

Page 9. Strike the following: "It was impossible to establish the identity of the loyal and the disloyal with any degree of safety. It was not that there was insufficient time in which to make such a determination; it was simply a matter of facing the realities that a positive determination could not be made, that an exact separation of the 'sheep from the goats' was unfeasible."

And replace with the following: "To complicate the situation, no ready means existed for determining the loyal and the disloyal with any degree of safety. It was necessary to face the realities—a positive determination could not have been made."

On June 5, 1943, General DeWitt issued a revised version (Ex. 85) of his final report on the Japanese evacuation. In that version of the report the underlined portions of the following statements were either deleted from or added to the original version of the Final Report:

Page iii, paragraph 2: "The security of the Pacific Coast continues to require the exclusion of Japanese from the area now prohibited to them *and will continue for the duration of the present war.*" (Deleted from the original version.)

Page iii, paragraph 2: *"More than 120,000 persons of Japanese ancestry resided in colonies adjacent to many highly sensitive installations. Their loyalties were unknown, and time was of the essence."* (Added to the original version.)

Page 9. *"It was impossible to establish the identity of the loyal and the disloyal with any degree of safety. It was not that there was insufficient time in which to make such a determination; it was simply a matter of facing the realities that a positive determination could not be made, that an exact sepa-*

*ration of the 'sheep from the goats' was unfeasible."* (Deleted from the original version and replaced by the following sentence.)

Page 9: *"To complicate the situation, no ready means existed for determining the loyal and the disloyal with any degree of safety. It was necessary to face the realities—a positive determination could not have been made."* (Added to the original version.)

On June 21, 1943, the Supreme Court handed down its decision, affirming the conviction of petitioner on the count charging curfew violation.

That General DeWitt did in fact believe that it was impossible to separate the loyal Japanese from the disloyal ones, is borne out by the transcripts of two telephone conversations which took place a few months before the publication of the initial version of the Final Report.

The first was a conversation between General DeWitt and Major General A.W. Gullion, the Provost Marshal General, on January 14, 1943. The subject matter of the conversation was the possibility that the Western Defense Command might be called upon to make thirty thousand or more loyalty investigations of individuals in the relocation centers. In the transcript (Ex. 63) of that telephone conversation the following appears:

DeWitt: I don't see how they can determine the loyalty of a Jap by interrogation ... or investigation.

Gullion: They've got a questionnaire that the Navy—some psychologist over there in the Navy sold to them.

DeWitt: There isn't such a thing as a loyal Japanese and it is just impossible to determine their loyalty by investigation—it just can't be done ...

The other was a conversation just four days later between General DeWitt and Assistant Secretary of War McCloy. General DeWitt was disturbed that he had been instructed to prepare for about 30,000 loyalty investigations. In the transcript (Ex. A–84) of that conversation the following appears:

DeWitt: Because I feel that I wouldn't be loyal to you or honest to you if I didn't say that it is a sign of weakness and an admission of an original mistake. Otherwise—we wouldn't have evacuated these people at all if we could determine their loyalty.

McCloy: I don't know whether we are at one on that—

DeWitt: I know we are not one on it—

McCloy: We evacuated them from the West Coast because we thought the front was immediate. We couldn't sort them out immediately.

It is further borne out by his statement in the original version of the Final Report that the security of the Pacific Coast required the exclusion of the Japanese from that area for the duration of the war. This can only be interpreted to mean that in his opinion the loyalty of a person of Japanese extraction could not be determined no matter how long the war might last.

In its brief to the Supreme Court in petitioner's appeal the government did not take the position that it was impossible to separate the loyal Japanese residents from those who were not. Rather, it was a lack of time that prevented that separation.

On page 35 of its brief the government stated:

"The classification was not based upon invidious race discrimination. Rather, it was founded upon the fact that the group as a whole contained an unknown number of persons who could not *readily* be singled out and who were a threat to the security of the nation and in order to impose effective restraints upon them it was necessary not only to deal with the entire group, but to deal with it *at once.*" (Emphasis added)

On page 61 it stated:

"The grave emergency called for *prompt* and decisive action."

On page 62 it stated:

"What was needed was a method of removing *at once* the unknown number of Japanese persons who might assist a Japanese invasion, and not a program for sifting out such persons in the indefinite future." (Emphasis added)

On page 63 it stated:

"The operative fact on which the classification was made was the danger arising from the existence of a group of over 100,000 persons of Japanese descent on the West Coast and the virtually impossible task of *promptly* segregating the potentially disloyal from the loyal." (Emphasis added)

The opinion of the Supreme Court in *Hirabayashi vs. United States,* reflected the court's acceptance of the government argument that the lack of time to separate the loyal from the disloyal justified action directed toward all individuals of Japanese ancestry. In its opinion the court stated:

"Whatever views we may entertain regarding the loyalty to this country of the citizens of Japanese ancestry, we cannot reject as unfounded the judgment of the military authorities and of Congress that there were disloyal members of that population, whose number and strength could not be precisely and *quickly* ascertained. We cannot say that the warmaking branches of the Government did not have ground for believing that in a critical hour such persons could not *readily* be isolated and separately dealt with, and constituted a menace to the national defense and safety, which demanded that *prompt* and adequate measures be taken to guard against it." (Emphasis added) 320 U.S. 81 at 99, 63 S.Ct. at 1385.

The position taken by the government with respect to the efficacy of loyalty hearings was set forth in a post-argument memorandum filed by Solicitor General Fahy with the Supreme Court on May 14, 1943. That memorandum stated in relevant part:

"Our position is not that hearings are an inappropriate method of reaching a decision on the question of loyalty. The Government does not contend that, assuming adequate opportunity for investigation, hearings may not ever be appropriately utilized on the question of the loyalty of persons here involved. It is

submitted, however, that in the circumstances set forth in our brief, this method was not available to solve the problem which confronted the country. The situation did not lend itself, in the unique and pressing circumstances, to solution by individual loyalty hearings. In any event, the method of individual hearings was reasonably thought to be unavailable by those who were obliged to decide upon the measures to be taken."

A great deal of additional documentary evidence was submitted by both petitioner and the government, but the evidence, outlined above, goes to the very heart of the issue before the Supreme Court, that is, the military necessity for the exclusion order. It demonstrates that General DeWitt ordered the exclusion of everyone of Japanese ancestry from the West Coast because of his belief that it was impossible to separate loyal Japanese from those who might be disloyal no matter how much time was devoted to that task.

General DeWitt's reason for ordering the exclusion was made known to the War Department in the original version of his Final Report. From the changes in that report which were insisted upon by the War Department there can be no doubt that the War Department was aware of, but did not agree with, General DeWitt's belief that it was the impossibility of separating the loyal from the disloyal Japanese that made their exclusion from the West Coast a military necessity.

A copy of the original version of the Final Report was never made available to the Justice Department. In consequence, all through the course of petitioner's appeal, that department was unaware of General DeWitt's stated reason for the exclusion of the Japanese from the West Coast. The Justice Department assumed and argued to the Supreme Court that the military necessity arose out of a lack of time to make a separation rather than out of an impossibility of making that separation.

Although the Justice Department did not knowingly conceal from petitioner's counsel and from the Supreme Court the reason stated by General DeWitt for the exclusion

of the Japanese, the government must be charged with that concealment because it was information known to the War Department, an arm of the government.

It is petitioner's position that the concealment by the government of the reasons stated by General DeWitt for the exclusion of the Japanese from the West Coast was a suppression of evidence which requires the vacation of petitioner's convictions.

Whether this action by the government warrants the vacation of petitioner's convictions requires the Court to consider whether a conviction may be set aside under a writ of error *coram nobis* and, if so, the requirements that must be met by one seeking the remedy of that writ.

■ A writ of error *coram nobis* is a seldom-used remedy, but if a petition for a writ of error *coram nobis* is found to be meritorious, a conviction may be set aside even though the petitioner has fully served his sentence on that conviction. *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954); *Holloway v. United States*, 393 F.2d 731, 732 (9th Cir.1968). Petitioner is not foreclosed, therefore, from availing himself of this remedy even though he long ago served the sentence which was imposed upon him.

■ In order for a writ of error *coram nobis* to be available to petitioner with respect to his conviction on the failure to report count, he must meet a number of requirements:

1. His petition must be brought in the court in which he was convicted. *United States v. Morgan*, 346 U.S. 502, 507 n. 9, 74 S.Ct. 247, 250 n. 9, 98 L.Ed. 248 (1954).

2. A more usual remedy must not be available to him. *James v. United States*, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982) (Brennan, J., dissenting from denial of petition for writ of certiorari).

3. He must demonstrate that he suffers present adverse consequences from his conviction sufficient to satisfy the case or controversy requirement of Article III. *United States v. Dellinger*, 657 F.2d 140, 144 n. 6 (7th Cir.1981).

4. He must show that there are valid reasons for his not having attacked his conviction earlier. *Maghe v. United States,* 710 F.2d 503 (9th Cir.1983).

5. He must demonstrate that the error of which he complains was of the most fundamental character. *United States v. Morgan,* 346 U.S. 502, 512, 74 S.Ct. 247, 253, 98 L.Ed. 248 (1954); *United States v. Taylor,* 648 F.2d 565, 570 (9th Cir.1981).

6. Finally, he must demonstrate that it is probable that a different result would have occurred had the error not been made. *United States v. Dellinger,* 657 F.2d 140, 144 n. 9 (7th Cir.1981).

In the present action the first requirement is clearly met. Petitioner brought his petition in the Western District of Washington, the district in which he was convicted.

The second requirement is also met. Petitioner's right to appeal from his conviction was exercised and exhausted long ago. His right to petition for habeas corpus relief is unavailable because he is no longer in custody. The writ of error *coram nobis* is at this time the only remedy available to him.

The requirement that petitioner must demonstrate that he presently suffers adverse consequences from his conviction is less clear. Understandably, misdemeanor convictions do not carry with them the adverse consequences that flow from felony convictions. Although it is highly unlikely that his 1942 conviction on the failure to report count would ever be used to impeach his credibility in any future civil or criminal trial, nonetheless it could be so used in jurisdictions, and there are some, which permit that use of misdemeanor convictions. It is true, too, that if petitioner were ever convicted for any other crime, a sentencing judge would be advised of that 1942 conviction and could properly take that conviction into consideration in fashioning an appropriate sentence. As was said in *Holloway v. United States,* 393 F.2d at 732: "Coram nobis must be kept available as a post-conviction remedy to prevent 'manifest injustice' even where the removal of a prior conviction will have little present effect on the petitioner."

■ The Court is of the opinion that petitioner has adequately demonstrated that he presently suffers adverse consequences from his conviction in 1942 of the crime charged in the first count of the indictment.

With respect to the requirement that petitioner must present valid reasons for his not having attacked his conviction earlier, the government argues that all of the factual material presented on behalf of petitioner has been a matter of public record for nearly forty years and that petitioner is hence bound by the doctrine of laches from seeking to overturn his convictions. The government particularly relies upon the book *Americans Betrayed* by Morton Grodzins, which was published in 1949.

The Court has read with care all of the excerpts from the Grodzins book which the government presented as an exhibit and which it asked the Court to consider. At no place in those excerpts is there any reference to the statements made by General DeWitt in the initial version of his Final Report. In none of the other publications submitted by the government is there any such reference.

Although it is true that at least one copy of the initial version of the Final Report survived, petitioner cannot be faulted for not finding and relying upon that version long before he brought this action in early 1983.

Ms. Aiko Herzig-Yoshinaga, a professional researcher, testified that it would have been exceedingly difficult for a lay person to locate that copy of the initial version of the Final Report. Although she had been employed as an archival researcher on the staff of the Commission on Wartime Relocation and Internment of Civilians between June 1981 and June 1983, she testified that it was not until the end of 1982 that she became aware of the existence of the initial version and then only because she had fortuitously observed that copy on the desk of an archivist in the Modern Military Sec-

tion of the National Archives and, upon examining it, recognized its wording to be different from that of the published version.

There is no evidence in the record that petitioner actually knew, or had reason to know, of the existence of the initial version of the Final Report prior to the time that Ms. Herzig-Yoshinaga happened upon it in the National Archives. Petitioner did not unduly delay the commencement of this action after he learned of the existence of the initial version of the Final Report.

■ The Court finds, in consequence, that petitioner has presented valid reasons for not having sooner brought his petition for writ of error *coram nobis*.

The requirements that the error of which the petitioner complains be of the most fundamental character and that, absent the error, it is probable that a different result would have occurred will be considered together.

The error of which petitioner complains is that, during the pendency of his appeal before the Supreme Court, neither he nor his counsel was informed by the government of the reason given by General DeWitt in the original version of his Final Report for the exclusion of all persons of Japanese ancestry from the West Coast. That statement was in essence that the military necessity, requiring the exclusion, was the impossibility of separating the loyal persons from the disloyal ones no matter how much time was devoted to that task.

It was General DeWitt who made the decision that military necessity required the exclusion of all persons of Japanese ancestry from the West Coast. The central issue before the Supreme Court in the appeal of petitioner from his conviction on the first count was whether exclusion was in fact required by military necessity. Nothing would have been more important to petitioner's counsel than to know just why it was that General DeWitt made the decision that he did. The attorneys for the Justice Department assumed, and argued to the Supreme Court, that it was the need for prompt action that made the exclusion a military necessity. The statements by General DeWitt in his Final Report belied that assumption. His statement was that it was not time that made the exclusion necessary but rather the impossibility of determining whether any particular individual was or was not loyal.

The disclosure of that information to petitioner's counsel and to the Supreme Court would have made it most difficult for the government to argue, as it did, that the lack of time made exclusion a military necessity. At the hearing on petitioner's petition Edward Ennis, who was in charge of the preparation of the brief for the government, testified that the whole thrust of the government's argument before the Supreme Court was that there was not sufficient time to make a differentiation between the loyal Japanese and those who might be disloyal. When asked what he would have done had he learned in March or April, 1943, of General DeWitt's statement, he answered that it would have presented "a very serious problem" and that it would have been "very dangerous" to take that position before the Supreme Court.

Had the statement of General DeWitt been disclosed to petitioner's counsel, they would have been in a position to argue that, contrary to General DeWitt's belief, there were in fact means of separating those who were loyal from those who were not; that the legal system had developed through the years means whereby factual questions of the most complex nature could be answered with a high degree of reliability. Counsel for petitioner could have pointed out that with very little effort the determination could have been made that tens of thousands of native-born Japanese Americans—infants in arms, children of high school age or younger, housewives, the infirm and elderly—were loyal and posed no possible threat to this country. More time might have been required to consider the loyalty of those who had spent their adult lives in truck gardening or farming or fishing, but a great number of those, too, could have been rather quickly found to be loyal and of no possible threat.

Had counsel for petitioner known and been able to present to the Supreme Court the reason stated by General DeWitt for the evacuation of all Japanese, it is this Court's opinion that the Supreme Court would have felt impelled to consider and to rule upon petitioner's appeal from his conviction on the failure to report count rather than confirming petitioner's sentence by simply affirming his conviction upon the curfew count. If the asserted ground was known by the Supreme Court to be the impossibility of separating the loyal from the disloyal, the Supreme Court would have found itself in an area of inquiry where its collective wisdom and its collective experience were far greater than that of General DeWitt. The justices of the Supreme Court were intimately familiar with the process of factual determinations. If the military necessity for exclusion was the impossibility of separating the loyal from the disloyal, the Supreme Court would not have had to defer to military judgment because this particular problem, separating the loyal from the disloyal, was one calling for judicial, rather than military, judgment.

█ The Court finds that the failure of the government to disclose to petitioner, to petitioner's counsel, and to the Supreme Court the reason stated by General DeWitt for his deciding that military necessity required the exclusion of all those of Japanese ancestry from the West Coast was an error of the most fundamental character and that petitioner was in fact very seriously prejudiced by that non-disclosure in his appeal from his conviction of failing to report. In consequence, petitioner's conviction on the failure to report count must be vacated.

█ With respect to petitioner's conviction on the curfew count, the Court has made the same analysis with respect to the requirements for the granting of a writ of error *coram nobis*. With respect to that conviction, the Court finds that it is unable to set aside the conviction of petitioner of violating the curfew order on a single day in May of 1942. After considering the arguments made in the government's brief before the Supreme Court with respect to the curfew violation and the lengthy opinion of the Supreme Court affirming that conviction, the Court is not persuaded that the non-disclosure of the statement made by General DeWitt with respect to the military necessity for exclusion was an error of the most fundamental character with respect to the curfew count or that the non-disclosure was actually prejudicial to petitioner with respect to that count.

Even though the curfew order was burdensome with respect to native-born Japanese since it lumped them in with alien Germans, alien Italians, and alien Japanese, the burden was nevertheless relatively mild when contrasted with the harshness of the exclusion order. Under the curfew order, petitioner and all others subject to that order, were permitted to live in their own homes, to continue to work at their places of employment, to travel back and forth from their homes to their places of employment, and, between six in the morning and eight in the evening, to move freely about so long as they remained within a distance of five miles from their places of residence. In addition, the curfew order was a temporary restriction. It was promulgated on March 24, 1942, and was, as a practical matter, relatively short lived. As soon as the exclusion orders became effective, the curfew order was supplanted by them.

By the time the petitioner's appeal had been heard by the Supreme Court, the curfew order had long since been replaced by the exclusion and relocation orders. The Court is persuaded that petitioner's conviction on the curfew count would without question have been affirmed by the Supreme Court even though the Supreme Court had been made aware of the reason given by General DeWitt for his ordering the exclusion of those of Japanese ancestry from the West Coast. His reason for the exclusion did not significantly undermine the earlier issuance of the curfew order. The Court must hence deny the petition of petitioner that his conviction on the curfew count be vacated.

Accordingly, the petition of petitioner that his conviction on Count I of the indictment be vacated is GRANTED. His peti-

tion that his conviction on Count II of the indictment be vacated is DENIED.