UNITED STATES of America,
Plaintiff–Appellant,

v.

Marvin MANDEL, W. Dale Hess, Harry W. Rodgers, III, William A. Rodgers, Irvin Kovens, and Ernest N. Cory, Defendants–Appellees.

No. 88–7027.

United States Court of Appeals,
Fourth Circuit.

Argued July 26, 1988.

Decided Dec. 7, 1988.

Martin Stanley Himeles, Jr., Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellant.

Arnold Murray Weiner (M. Albert Figinski, Stuart R. Berger, William F. Gately, H. Thomas Howell, Baltimore, Md., William G. Hundley, Thomas C. Green, Washington, D.C., Ernest N. Cory, Jr., Laurel, Md., on brief), for defendants-appellees.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

WIDENER, Circuit Judge:

The government appeals the granting of a writ of error *coram nobis* vacating the 10-year-old convictions of Marvin Mandel, former governor of Maryland, W. Dale Hess, Harry W. Rodgers, III, William A. Rodgers, Irvin Kovens and Ernest N. Cory (petitioners) for mail fraud and racketeering. We affirm the district court's decision which vacated the convictions and required the government to return to the petitioners all fines paid.

On November 24, 1975, a Special Grand Jury for the District of Maryland charged the petitioners in a 24-count indictment with mail fraud in violation of 18 U.S.C. § 1341 and prohibited racketeering activity in violation of 18 U.S.C. §§ 1961 et seq.[1]

---

1. 18 U.S.C. § 1962 provides in pertinent part:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

The indictment, in essence, charged the petitioners with participating in a mail fraud scheme involving gifts of clothing, jewelry and interests in land to support legislation that would be beneficial to the Marlboro Race Track, which Mandel's codefendants either owned or were interested in.[2]

Specifically, the 20 mail fraud counts of the indictment charged that, beginning between January 7, 1969 and the spring of 1971, and continuing until the filing of the indictment, petitioners devised and intended to devise a scheme and artifice:

(a) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performance of official duties of MARVIN MANDEL, in his official capacities as Governor of the State of Maryland, free from bribery, corruption, partiality, willful omission, bias, dishonesty, deceit, official misconduct and fraud;

(b) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have the state's business and its affairs conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct and fraud, and in accordance with the laws and Code of Ethics of the State of Maryland;

(c) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have available and to be made aware of all relevant and pertinent facts and circumstances when:

(1) drafting, considering and deliberating upon proposed legislation for the State of Maryland with respect to the Maryland horse racing industry and to other matters;

(2) administering the laws of the State of Maryland with respect to the Maryland horse racing industry and to other matters; and

(3) transacting business for and on behalf of the State of Maryland;

(d) To obtain, directly and indirectly, money, property and other things of value, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts, relating to the Marlboro Race Track, the Bowie Race Track, the Security Investment Company, Ray's Point, Inc., and to other matters.

Count 21 of the indictment charged Mandel with acquiring and maintaining an interest in and control of the Security Investment Company through a pattern of racketeering activity that included mail fraud and bribery under Maryland law.[3] Count 23 charged Hess, Harry Rodgers and William Rodgers with conducting the affairs of the Security Investment Company through a pattern of racketeering activity that included bribery and mail fraud. The district court entered a judgment of acquittal on this count and it is not an issue here. Count 24 charged Hess, Harry Rodgers, William Rodgers, Kovens and Cory with conducting and participating in the conduct of the affairs of the Marlboro Race Track through a pattern of racketeering activity that included mail fraud.

Prior to trial, the petitioners moved to dismiss the indictment "arguing, *inter alia*, that the indictment fails to allege a cognizable scheme to defraud ...," *United States v. Mandel*, 415 F.Supp. 997, 1003 (D.Md.1976), in that "the intangible rights allegedly defrauded by the scheme do not constitute 'something of value' whose dep-

participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity or collection of unlawful debt.

2. The panel's decision on direct appeal in this case, in some detail in *United States v. Mandel*, 591 F.2d 1347, 1353–57 (4th Cir.1979), sets out the facts which the government alleged constituted the scheme.

3. Count 22 also charged Mandel with engaging in a pattern of racketeering activity, but was dismissed prior to trial. *Mandel*, 591 F.2d at 1352, n. 3.

rivation can be punished under the mail fraud statute." The motion was denied, and the matter proceeded to trial on June 1, 1977.

The district court instructed the jury on August 9, 1977. The pertinent part of the mail fraud instructions was as follows:

The words scheme or artifice, as used in the mail fraud statute, mean any plan or course of action intended to defraud others, *or* to obtain money or property by means of false or fraudulent pretenses, representations or promises.

A statement or representation is false or fraudulent within the meaning of this statute if known to be untrue or made with reckless indifference as to its truth or falsity, and made or caused to be made with the intent to deceive.

A false or fraudulent representation may be made by statements or half-truths, or the concealment of material facts, as well as by affirmative statements or acts.

The mail fraud statute prohibits any scheme utilizing the mails that is reasonably calculated to deceive persons of ordinary prudence and comprehension.

A scheme to defraud, within the meaning of the statute, may be defined as the intentional use of false or fraudulent representations for the purpose of gaining a valuable undue advantage or working some injury to something of value held by another.

*A citizen's right to have his Government conducted honestly and impartially, and to the faithful and loyal services of public officials, are things of value` whose fraudulent deprivation may fall within the meaning of scheme to defraud as used in the mail fraud statute.*

*Additionally, a scheme to defraud public officials of information material to a decision which they are required to make in their official capacity may also come within the meaning of scheme to defraud as used in the mail fraud statute.* (Emphasis added)

The petitioners specifically requested, but, upon objection by the government, the court declined to give, an instruction requiring the jury to find a scheme to defraud the State of money or property in order to convict on the mail fraud counts. See *United States v. Mandel,* 672 F.Supp. 864, 870 (D.Md.1987).

The petitioners were each adjudged guilty of 15 counts of mail fraud under § 1341 and one count of prohibited racketeering activity under §§ 1961 et seq.[4] Mandel was sentenced to a four-year prison term; Hess, Harry Rodgers and Kovens were each sentenced to four years' imprisonment and fined $40,000; William Rodgers was sentenced to 20 months' imprisonment and fined $40,000; and Cory was sentenced to 18 months' imprisonment. *Mandel,* 591 F.2d at 1352–53. Additionally, pursuant to 18 U.S.C. § 1963(a), Hess, Harry Rodgers, William Rodgers, Kovens and Cory were ordered to forfeit their ownership interest in the Southern Maryland Agriculture Association, Inc. (the holding corporation of the Marlboro Race Track), based on their convictions under count 24 of the indictment for racketeering. 591 F.2d at 1352, 1353.

Petitioners promptly appealed, claiming, among other things, that their convictions under the mail fraud statute constituted an unwarranted extension of the statute and an impermissible federal intrusion into the political affairs of the State of Maryland. *Mandel,* 672 F.Supp. at 870. Our panel decision found this claim without merit,[5]

4. The jury, after 13 days of deliberation, in the middle of which it was given a modified *Allen* charge by the district court, returned verdicts of guilty against the appellees on all but three of the mail fraud counts. The jury returned verdicts of not guilty on counts 5, 6 and 14 (mail fraud) of the indictment. The district court entered judgments of acquittal as to counts 19 and 20 (mail fraud) of the indictment. Additionally, the jury returned verdicts of guilty on

counts 21, 23 and 24 (racketeering) of the indictment. The district court entered a judgment of acquittal on count 23 of the indictment. *Mandel,* 591 F.2d at 1352, n. 3.

5. This was in line with earlier opinions of this court. See *United States v. Price,* 788 F.2d 234, 237 (4th Cir.1986), *vacated* and *remanded, McMahan v. United States,* 483 U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987), *on rehearing*

591 F.2d at 1358, but held that there had been erroneous admission and exclusion of evidence and that the jury instructions on bribery were inadequate with regard to the mail fraud counts, 591 F.2d at 1365. We vacated the convictions and remanded for a new trial. 591 F.2d at 1376. On June 5, 1979, we reheard the matter *en banc,* and an equally divided court affirmed the district court's convictions. *United States v. Mandel,* 602 F.2d 653 (4th Cir.1979) (per curiam).[6] Mandel and his codefendants filed a petition for writ of certiorari to the Supreme Court, and it was denied. *Mandel v. United States,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

All the petitioners have now served their sentences. Mandel served 19 months of his four-year sentence, the remainder being commuted. He also was disbarred because of his federal conviction. 672 F.Supp. at 871. Hess served 18 months of his three-year sentence, the remainder being commuted, and he paid a total of $40,000 in fines. Harry Rodgers and William Rodgers each served their prison terms, three years and a year and a day respectively, and they each paid $40,000 in fines. Kovens served his three-year term and paid a total of $40,000 in fines. Cory's 18–month term of imprisonment was suspended. 672 F.Supp. at 871.

Almost 10 years after petitioners were convicted and more than five years after they completed service of their sentences, the Supreme Court decided *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), holding that the mail fraud statute, 18 U.S.C. § 1341, does not protect against schemes to defraud persons of their intangible rights such as the right to honest government. Based on the Supreme Court's decision in *McNally,* the petitioners filed petitions for writs of error *coram nobis* in the district

court in Maryland on August 13, 1987, to vacate their convictions and to require the government to return all fines paid and property forfeited. The district court issued its memorandum opinion and order granting the writs, vacating the petitioners' convictions and ordering that all fines be repaid.[7] From this order, the government took its appeal.

The federal mail fraud statutes were first enacted in 1872 as part of a recodification of the postal laws to protect citizens from the use of the mails in furtherance of schemes to defraud. See *Parr v. United States,* 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960); *Durland v. United States,* 161 U.S. 306, 314, 16 S.Ct. 508, 511–12, 40 L.Ed. 709 (1896). And in the 1970's, the lower federal courts began expanding the scope of the rights protected by § 1341 to include certain intangible rights such as the voters' right to an honest election, *United States v. States,* 488 F.2d 761, 765 (8th Cir.1973) *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974), the citizens' right to the loyal and faithful services of public officials, *United States v. Caldwell,* 544 F.2d 691, 696 (4th Cir.1976), and employers' rights to the loyal and faithful services of their employees, *United States v. George,* 477 F.2d 508, 513 (7th Cir.1973), *cert. denied,* 414 U.S. 827, 94 S.Ct. 158, 38 L.Ed.2d 61 (1973). However, the Supreme Court in *McNally,* 483 U.S. 350, 107 S.Ct. 2875, considerably narrowed the scope of the rights protected by § 1341.

*McNally* involved a kickback scheme in which James E. Gray, a former Kentucky official, and Charles J. McNally, a private individual, were charged in the indictment with devising a scheme "(1) to defraud the citizens and government of Kentucky of their right to have the Commonwealth's

---

*United States v. Price,* 857 F.2d 234 (4th Cir. 1988).

**6.** The entire opinion follows:

The judgments of conviction are affirmed by an equally divided court.

A majority of the members of the *en banc* court would affirm the judgments of conviction against all of the contentions of the ap-

pellants except the claim of error in the charge to the jury which was the point upon which there was equal division.

**7.** The district court order did not address petitioners' request that the forfeited property be returned. The parties have since resolved this issue by stipulation.

affairs conducted honestly, and (2) to obtain, directly or indirectly, money and other things of value by means of false pretenses and the concealment of material facts." [8] *McNally,* 483 U.S. at ——, 107 S.Ct. at 2876–77. The indictment alleged that the petitioners and a third individual, Howard P. Hunt, received kickbacks from the State's workers' compensation insurance provider. Hunt was the chairman of the state Democratic Party and had *de facto* control over selecting the insurance agencies from which the State would purchase its policies.

In 1975, the State workers' compensation insurance provider, Wombwell Insurance Company of Lexington, Kentucky, agreed with Hunt to share any commissions in excess of $50,000 a year with other insurance agencies specified by Hunt, including payments to Seton Investment, Inc., which was controlled by Hunt and Gray and nominally owned and operated by McNally. Wombwell also paid commissions to Snodgrass Insurance Agency, which in turn gave money to McNally.

Hunt was charged with, and pleaded guilty to, mail and tax fraud and was sentenced to three years' imprisonment. The jury convicted Gray and McNally of both mail fraud and conspiracy, and the court of appeals affirmed. *United States v. Gray,* 790 F.2d 1290 (6th Cir.1986). The Supreme Court granted certiorari and reversed the court of appeals. It held that § 1341 is "limited in scope to the protection of property rights." *McNally,* 483 U.S. at ——, 107 S.Ct. at 2880–82. The Court noted that the jury in *McNally* was not required to find that the State itself was defrauded of any money or property or even that, absent the scheme, the State would have paid lower insurance premiums. Thus, the instructions on the mail fraud count "permitted a conviction for conduct not within the reach of § 1341." Permitting such a conviction, the Court held was error.

The Court rejected the line of courts of appeals' decisions, holding that the mail fraud statute protects against schemes to defraud citizens of their intangible right to honest and impartial government. "The mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." 483 U.S. at ——, 107 S.Ct. at 2878–80.

■ Petitioners argue, and we agree, that this case is indistinguishable from *McNally,* and, thus, the petitioners here were convicted for conduct we now know is "not within the reach of § 1341." 483 U.S. at ——, 107 S.Ct. at 2882–84.

■ The government asserts that the foundation for its mail fraud charge was the bribery of Mandel, and that under its theory of the case the jury necessarily found that Mandel received property in exchange for favorable treatment for the owners of Marlboro.[9] This argument confuses the requirements of the *McNally* decision. *McNally* does not allow a mail fraud conviction merely on the finding that those charged received *any* property in connection with the scheme; *McNally* requires a finding that the scheme *defrauded* or *intended to defraud* someone of money or property. 483 U.S. at ——, 107 S.Ct. at 2880–82. As in *McNally,* a conviction here was permitted without a finding that the State was defrauded of money or property, only of the "conscientious, loyal, faithful, disinterested and unbiased services" of Marvin Mandel, in the very words of the indictment, substantially repeated in the jury charge.

In the alternative, the government contends the bribery scheme defrauded the

---

8. Gray and McNally were also charged with conspiracy to violate the mail fraud statute and conspiracy to defraud the United States by obstructing the collection of federal taxes. *McNally,* 483 U.S. at ——, 107 S.Ct. at 2878–80.

9. There is some doubt whether the jury was ever adequately instructed on the *quid pro quo* element of bribery. The Fourth Circuit panel reversed and an equally divided *en banc* court affirmed on this issue. See note 7 and accompanying text. In any event, whether or not the jury was properly instructed on the issue is immaterial, for, in the words of *McNally,* "... the jury was not required to find that the ... [State of Maryland] itself was defrauded of any money or property." 483 U.S. at ——, 107 S.Ct. at 2880–82.

State of Maryland of property under two separate theories. First, the government argues that the State was deprived of the bribes given Mandel, which belonged to the State under a constructive trust theory. Second, the State was deprived of the racing days allotted to the Marlboro Race Track in exchange for the bribes. We recognize that two cases subsequent to *McNally*, in which the juries were instructed on intangible rights, have upheld mail fraud convictions on similar theories. They are *United States v. Richerson*, 833 F.2d 1147 (5th Cir.1987), and *United States v. Runnels*, 833 F.2d 1183 (6th Cir.1987). Neither of those cases, however, is persuasive here.

*Richerson* was a conviction of conspiracy to commit mail fraud on account of a kickback scheme in which the defendant, in return for kickbacks, approved false invoices submitted by suppliers to his private employer. The jury was instructed in part, without objection, that the defendant had a duty to his employer not to conceal facts he had reason to believe were material and that such concealment would deprive the employer of the honest and loyal services of the employee. On appeal, the court affirmed the conviction, giving three alternate grounds. First, it held *McNally* did not apply to cases "involving employee fraud" of a private employer, 833 F.2d at 1147, thereby confining *McNally* to its facts, a scheme to defraud state citizens of their intangible rights to honest and impartial government. As an alternate ground, the court construed the district court's jury instruction as requiring a finding that the defendant breached his duty of loyalty through concealment of material information and held that such concealment affected his employer's property rights. 833 F.2d at 1157. The third alternate ground for affirmance was that, in any event, the error in the charge did not rise to the level of plain error because objection was not taken at trial. 833 F.2d at 1147. None of the grounds for affirmance relied upon in *Richerson* are present here. This is not a case of a private employer; rather, the State of Maryland is involved just as was the Commonwealth of Kentucky in *McNal-*

*ly*. The jury charge given in this case did not require the finding that Mandel breached any duty affecting property rights; rather, it permitted a conviction, in the words of the jury charge, upon a finding that "... faithful and loyal service of public officials, are things of value whose fraudulent deprivation may fall within the meaning of scheme to defraud as used in the mail fraud statute." Plain error also does not enter into this case. Mandel has been making the same *McNally* objection to the indictment and charge in this case, directly or inferentially, ever since he was indicted in 1975.

*Runnels* was a case of conviction for mail fraud of a local union president, who, for a kickback, would refer workers' compensation claims to an attorney who was also a convicted defendant in the case. The jury charge included an instruction on intangible rights, which the court of appeals acknowledged was erroneous, 833 F.2d at 1188, thus taking a different tack than the *Richerson* court. It held, however, that the conviction should be affirmed because the jury verdict necessarily demonstrated that the business agent, Runnels, did accept the payments and also because of its legal conclusion that such payments belonged to the union. The court acknowledged that it was affirming a criminal conviction on a theory not properly advanced at trial. 833 F.2d at 1183. *Runnels* also is not persuasive. Whatever the rule may be elsewhere, we hold that in a case in which the jury considers alternate theories of liability, we must reverse the convictions if either theory is an improper basis for punishment. *United States v. Mallas*, 762 F.2d 361, 363, n. 3 (4th Cir.1985). The latest application of this rule that we find is in *Mills v. Maryland*, —— U.S. ——, ——, 108 S.Ct. 1860, 1866–67, 100 L.Ed.2d 384 (1988). In order not to apply the rule, we must be able to say "with a high degree of probability" that the jury did not rely on the legally incorrect theory. *United States v. Alexander*, 748 F.2d 185, 189 (4th Cir. 1985). Such is not possible in this case, of course. As demonstrated, the jury was quite free, and indeed instructed, to return

a guilty verdict solely on the theory that the State of Maryland had been denied the "faithful and loyal services of public officials." This was annunciated by the fact that the bribery instruction offered by the defendants, requiring a finding that the State was defrauded of a money or property interest, was denied by the district court at the government's urging.

Even if the government's theories mentioned just above may be proper subsequent to *McNally*, they are not at issue in this case because the jury was not instructed on them. See *McNally*, 483 U.S. at ——, 107 S.Ct. at 2880–84: "Although the Government now relies in part on the assertion that the petitioners obtained property ... there was nothing in the jury charge that required such a finding." In *Mandel*, there was one theory of the case before the jury which would alone permit conviction, that the State of Maryland and its citizens were defrauded of the honest and faithful services of Mandel, and this was sufficient to convict the petitioners of mail fraud. *Mandel*, 672 F.Supp. at 869. In fact, as we have noted, the court, at the government's urging, specifically rejected an instruction offered by the petitioners requiring for conviction a finding that the State was defrauded of some money or property interest.

Thus, the jury instructions were insufficient and the convictions for mail fraud cannot be upheld under *McNally* standards.[10] Nor may the convictions for racketeering be upheld.

Count 24 of the indictment, as noted earlier, charged all the petitioners, except Mandel, with violation of the RICO statute premised solely on the mail fraud offenses. Since none of the underlying offenses of mail fraud remain viable after *McNally*, the racketeering convictions under count 24 also must be vacated. See *United States v. Truglio*, 731 F.2d 1123, 1132 (4th Cir.1984) *cert. denied*, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984). While count 21 charged Mandel with criminal violation of RICO premised not only on the mail fraud charges but also on two alleged acts of bribery in violation of Maryland law, it too must be set aside. If one of two predicate offenses underlying a substantive RICO count is vacated, the RICO count also must be vacated. *United States v. Joseph*, 781 F.2d 549, 554 (6th Cir.1986). And, since we may not know whether the mail fraud or the bribery charges of Count 21, or both, were considered by the jury, that conviction also must be vacated. See *Mallas*, supra; *United States v. Holzer*, 840 F.2d 1343, 1352 (7th Cir.1988).

Based on this analysis, it is clear to us that if this case were before us on direct appeal we would be required to overturn all the convictions. The issue here, however, is whether *coram nobis* relief is appropriate in this case. We think that it is required in order to achieve justice.

In *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), the

---

10. *Accord: United States v. Price*, 857 F.2d 234 (4th Cir.1988); *United States v. Ochs*, 842 F.2d 515 (1st Cir.1988); *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988); *United States v. Murphy*, 836 F.2d 248 (6th Cir.1988); *United States v. Gordon*, 836 F.2d 1312 (11th Cir.1988); *United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987); see also *United States v. Covino*, 837 F.2d 65 (2d Cir.1988).

*Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), is not to the contrary. In *Carpenter*, a reporter for the Wall Street Journal, whose column had an impact on the stock market, conspired with a stock broker for pre-publication release of the column to the broker, which enabled the broker to take advantage of the forthcoming impact of the column on the market. The Court held that the column and the information in it were the property of the Wall Street Journal and that its intangible nature did not make it any less property protected by the mail fraud statute than tangible personal property. It was not the same, the Court decided, as a scheme to defraud citizens of their intangible rights to honest and impartial government. —— U.S. at ——, 108 S.Ct. at 320–22. While the Court described the Journal's right to the reporter's honest and faithful service as an interest "too ethereal in itself to fall within the protection of the mail fraud statute," the object of the scheme was to take the Journal's confidential business information, as well as its publication right, intangible property rights, and turn them over without authority to the broker. Thus, the Court distinguished "intangible property rights" from "intangible rights to honest and impartial government." —— U.S. at ——, 108 S.Ct. at 320–22.

Supreme Court established that federal courts have the power under the All–Writs Act, 28 U.S.C. § 1651(a) to grant a writ of error *coram nobis* to vacate a conviction after the sentence has been served.[11] The Court held that the extraordinary remedy should be issued, however, "only under circumstances compelling such action to achieve justice." 346 U.S. at 511, 74 S.Ct. at 252. An error "of the most fundamental character" must have occurred to warrant issuing the writ, and no other remedy may be available. We follow the Second Circuit, which, in an opinion by Judge Friendly, has specifically allowed the granting of a writ of error *coram nobis* in light of a retroactive dispositive change in the law of mail fraud. *United States v. Travers,* 514 F.2d 1171 (2d Cir.1974).

The petitioners in this case have served their sentences. They appealed their cases at each stage of the proceeding. They have no other remedy available other than a writ of error *coram nobis.* Based on the Supreme Court's ruling in *McNally,* the jury instructions in this case improperly allowed petitioners' convictions for acts which are not within the reach of the mail fraud statute.

The government argues, however, that granting a writ of error *coram nobis* is improper where the change in the law did not vitiate the criminality of the petitioners' conduct but only brings into question the propriety of the jury instructions. See *United States v. Keane,* 852 F.2d 199 (7th Cir.1988). The government urges that society's interest in the finality of criminal convictions requires us to look beyond the improper instructions to the record to de-termine if adequate evidence of criminal activity existed on which to base a conviction under post-*McNally* standards. In essence, the government asks this court to review the evidence and decide what a jury would or might have found if the instructions had been proper, or, to put it more bluntly, it asks us to convict the defendants of crimes with which they were not charged. This, we decline to do. The sufficiency of the evidence in a case is a question in each instance to be submitted to a jury, subject only to being set aside for insufficiency. *United States v. Caudle,* 758 F.2d 994, 997 (4th Cir.1985). We are not organized to decide if the petitioners are bad men or even if they have committed crimes. Our function is to decide whether or not, under the law, they are guilty of the crimes as charged in the indictment, and we decide that they are not.

Petitioners were tried and convicted under § 1341 and, thus, also of prohibited racketeering activities under 18 U.S.C. §§ 1961 *et seq.* for acts the Supreme Court has held are not within the reach of the federal mail fraud statute. Without *coram nobis* relief, the petitioners, who contested their guilt at each stage of the proceeding, would face the remainder of their lives branded as criminals simply because their federal trial occurred before rather than after the Supreme Court's ruling in *McNally.*[12] See *Travers,* 514 F.2d at 1178–79.

Accordingly, the district court's granting of the writ and its order that the government return any fines in connection therewith [13] is

AFFIRMED.[14]

---

**11.** See *Morgan,* 346 U.S. at 507–11, 74 S.Ct. at 250–52, for the history of the development of the writ of error *coram nobis.*

**12.** "Conviction of a felony imposes a *status* upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but which also seriously affects his reputation and economic opportunities." *Parker v. Ellis,* 362 U.S. 574, 593–94, 80 S.Ct. 909, 919–20, 4 L.Ed.2d 963 (1960) (Chief Justice Warren dissenting).

**13.** The propriety of the court's order requiring the return of any fines paid in connection with these convictions is not at issue in this case because the government has stipulated that "vacating the criminal convictions would result in restitution of any criminal fines in connection therewith...." 672 F.Supp. at 867, n. 2.

**14.** The dissent deserves two comments.

First, a substantial part of its distinguishing of *United States v. Travers,* 514 F.2d 1171 (2nd Cir.1974), which is substantially on all fours with our case here, consists of this statement: "Clearly, this is a situation where justice compels issuance of the writ because Travers had committed no crime." Dissenting op. p. 1077. This conclusion by the dissent is contrary to the *Travers* opinion which states that: "Travers, to

K.K. HALL, Circuit Judge, dissenting:

Because the majority misperceives the proper standard of review for writs of error *coram nobis,* and because this misperception leads to an improper result in this case, I must respectfully write in dissent.

### I.

I have no quarrel with the majority's rendition of the facts or with its analysis concerning the effect of *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), on the substantive law of mail fraud. There is no doubt that were these convictions before this court on direct appeal, they would have to be overturned. However, they are not. Appellants have already fully litigated their positions and have already had the benefit of direct appellate review. *United States v. Mandel,* 591 F.2d 1347 (4th Cir.1979) (vacating the convictions and remanding for a new trial); 602 F.2d 653 (4th Cir.1979) (en banc) (reinstating the convictions and affirming the district court), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). This is a collateral attack through the extraordinary means of a writ of error *coram nobis.* The distinction between the review appropriate in these two very different types of proceedings is given wholly inadequate consideration by the majority and although treated more extensively by the court below, is applied incorrectly.

It has been black letter law since the Supreme Court recognized the coram nobis writ in *United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), that a reviewing court should grant the writ "only under circumstances compelling such action to achieve justice." *Id.* at 511, 74 S.Ct. at 252. Coram nobis should be granted only "to correct errors of the most fundamental character where the circumstances are compelling to achieve justice." *Correa–Negron v. United States,* 473 F.2d 684, 685 (5th Cir.), *cert. denied,* 414 U.S. 870, 94 S.Ct. 89, 38 L.Ed.2d 88 (1973).

The reason this rigorous burden of proof is placed on a coram nobis petitioner is obvious. All collateral attacks significantly, and detrimentally, impact on society's interest in the finality of criminal convictions.

> Inroads on the concept of finality tend to undermine confidence in the integrity of our procedures. Moreover, increased volume of judicial work associated with the processing of collateral attacks inevitably impairs and delays the orderly administration of justice. Because there is no limit on the time when a collateral attack may be made, evidentiary hearings are often inconclusive and retrials may be impossible if the attack is successful.

*United States v. Addonizio,* 442 U.S. 178, 184 n. 11, 99 S.Ct. 2235, 2239–40 n. 11, 60 L.Ed.2d 805 (1979) (citations omitted) (habeas corpus); *quoted in United States v. Dellinger,* 657 F.2d 140, 144 (7th Cir.1981) (coram nobis); *see also United States v. Keane,* 852 F.2d 199, 201 (7th Cir.1988). This impact is amplified in a coram nobis petition. Unlike the habeas situation where there exists a significant incentive for the government to retry a successful petitioner so that he must serve out his sentence, in the coram nobis context,[1] the

---

be sure, engaged in criminal conduct, but not in the crime for which he was convicted." 514 F.2d at 1179.

Second is its reliance on *United States v. Keogh,* 391 F.2d 138, 148, (2d Cir.1968), for the reasoning that "The government is simply unlikely to allocate its prosecutorial resources to retry a defendant who will not be resentenced." Dissenting op. p. 1077. That statement from *Keogh* has no application here. The defendant in *Keogh* contested by *coram nobis* admissibility of evidence and procedural irregularities claimed to be of constitutional dimension and would have been tried the second time for the

same crime he had been tried and sentenced for the first time around, and which sentence had been served. Here, Mandel, et al, may not be tried for the same crime. The Supreme Court has made that clear in *McNally.*

Thus, the dissent's treatment of the Second Circuit opinions, both of which have bearing on our case, fails in each instance.

1. My discussion of coram nobis addresses only the situation when the writ is sought after the petitioner's sentence has been served. Obviously, much of my analysis would not apply to writs sought before a petitioner begins to serve his sentence. *See* 3 C. Wright, *Federal Practice*

likelihood of retrial and the corresponding vindication of society's interest in preserving a valid conviction is greatly diminished. *United States v. Keogh,* 391 F.2d 138, 148 (2d Cir.1968). The government is simply unlikely to allocate its precious prosecutorial resources to retry a defendant who will not be resentenced. *Id.* Thus, while it is clear that coram nobis and habeas corpus are roughly "similar" proceedings, *United States v. Travers,* 514 F.2d 1171, 1173 n. 1 (2d Cir.1974); *United States v. Little,* 608 F.2d 296, 299 (8th Cir.1979) ("substantially equivalent"), it is even more clear that the burden on a coram nobis petitioner is, and properly should be, greater than that placed on a habeas petitioner. Coram nobis petitions that attempt to overturn convictions in which the petitioner has fully and exhaustively litigated his position should be granted only in the most egregious cases, where circumstances make clear that justice cannot tolerate letting the conviction stand. To grant coram nobis relief more freely would spawn criminal "re"-litigation without end. *Keane, supra,* at 206. Consequently, it is with these considerations in mind that we should review petitioner's convictions.

## II.

Four criteria must be met before coram nobis relief is appropriate:

(1) a more usual remedy is not available;

(2) valid reasons exist for not attacking the conviction earlier;

(3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and

(4) the error is of the most fundamental character. *Hirabayashi v. United States,* 828 F.2d 591, 604 (9th Cir.1987).

The government concedes that because petitioners have served their sentences, a more usual remedy is not available; that because *McNally* was just recently decided, petitioners could not have contested their convictions any earlier; and, that sufficient adverse consequences remain from peti-

tioners' convictions to create a valid controversy for the purposes of Art. III. Both the court below and the majority have also concluded that the error present in this case is so fundamental that justice compels that these convictions be set aside. Both put great weight on the Second Circuit's decision in *United States v. Travers,* 514 F.2d 1171 (2d Cir.1974). Both are mistaken.

In *Travers,* the petitioner was convicted of mail fraud for his involvement in a counterfeit credit card scheme. The *only* actions alleged by the government to have violated 18 U.S.C. §§ 1341, 1342 were the defrauded merchants' mailing of the credit card receipts for the purpose of collecting for the goods and services purchased with the counterfeit cards. After Travers had served his sentence, the Supreme Court decided *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), holding that such mailings, made after the fraudulent use of the credit card has taken place, are not a part of a fraudulent credit card scheme because they occur after the scheme has reached fruition. *Id.* at 402, 94 S.Ct. at 649. Therefore, the *Travers* court found coram nobis relief appropriate in a case where the intervening change in law left *no* grounds for sustaining the conviction. Clearly, this is a situation where justice compels issuance of the writ because Travers had committed no crime. The *Travers* court expressly recognized this when it acknowledged that "Travers was convicted and punished for an act that the law does not make criminal," and observed that "there was *no* sufficient evidence to support this conviction." *Id.* at 1176, 1178 (quotations omitted) (emphasis added). Plainly, the *Travers* situation is not present here.

The government advances two valid theories as to why petitioners' conduct is criminal even in light of *McNally.* The first posits that the state was deprived of the bribes given Mandel, which rightfully belonged to the State under a constructive

*and Procedure: Criminal* § 592 at 430 n. 15     (1982).

trust.[2] At least three circuits have recognized this theory. *United States v. Richerson*, 833 F.2d 1147 (5th Cir.1987); *United States v. Runnels*, 833 F.2d 1183 (6th Cir. 1987); *Ingber v. Enzor*, 841 F.2d 450 (2d Cir.1988). The second contends that the State was deprived of control over the allocation of the racing days that were shifted to the Marlboro Race Track in exchange for the bribes. These racing days are in essence a license to operate a very profitable business that produces significant revenues for the state.[3] Neither the majority nor the court below found these theories invalid. Rather, both ruled that they were not relevant because the jury was not specifically instructed on them. However, they are relevant, extremely relevant, because this is not a direct appeal. This is a petition for coram nobis relief. If either of these theories is valid, which both are, and if there is sufficient evidence to support the verdict, which there clearly is, then the petitioners are guilty of conduct still illegal under the mail fraud statute.[4] This distinguishes this case from *Travers* and drastically redirects the analysis necessary to overturn these convictions. Because petitioners conduct is still illegal under post-

*McNally* law, they complain merely of the improper instructions given at their trial.

Those instructions were clearly faulty in that they allowed for conviction of petitioners without a specific finding that the government was defrauded of a property interest. However, they also described a scheme for which a valid post-*McNally* conviction could be had.[5] Furthermore, the evidence presented at trial was more than sufficient to sustain a verdict that the state had been deprived of property. I believe that for coram nobis purposes, this is more than sufficient to sustain these convictions.

The majority rejects this position, citing this Court's decision in *United States v. Alexander*, 748 F.2d 185, 189 (4th Cir. 1985), which held that when a jury considers alternate theories of liability, we must reverse the convictions if either theory is invalid unless we can say "with a high degree of probability" that the jury did not rely on the invalid theory. *Id.* at 189. I, of course, agree with this proposition and agree that in this case, a reviewing court could not ascertain with sufficient probability upon which theory the jury relied.

2. The total amount received by Mandel has been conservatively estimated at $380,000.

3. In 1978, 558 total racing days brought in revenues for the state of Maryland in excess of 20.7 million dollars.

4. This Court's recent decision in *U.S. v. Price*, 857 F.2d 234 (4th Cir.1988), is not to the contrary. There we held only that 18 U.S.C. § 1341 did not protect "intangible rights such as good government or honest union management." *Id.* at 235. No alternate theories of culpability were even discussed, let alone rejected. The Supreme Court's recent decision in *Carpenter v. U.S.*, — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), demonstrates that these alternate theories are completely compatible with *McNally*.

5. The indictment, which was read to the jury, in part charged:
    (a) *To defraud the citizens of the State of Maryland,* and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performance of official duties of MARVIN MANDEL, in his official capacities as Governor of the State of Maryland, *free from bribery,* corruption, par-

tiality, willful omission, bias, dishonesty, deceit, official misconduct and *fraud;*
    (d) *To obtain, directly and indirectly, money, property and other things of value, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts,* relating to the Marlboro Race Track, the Bowie Race Track, the Security Investment Company, Ray's Point, Inc., and to other matters.
Likewise, the instructions also prominently mentioned property:
    The words scheme or artifice, as used in the mail fraud statute, mean any plan or course of *action intended to defraud others, or to obtain money or property by means of false or fraudulent pretenses, representations or promises....*
    *A scheme to defraud, within the meaning of the statute, may be defined as the intentional use of false or fraudulent representations for the purpose of gaining a valuable undue advantage or working some injury to something of value held by another.*
Thus, the idea that petitioners had defrauded the state out of property, or a property interest, was presented to the jury. Either of the government's theories, *i.e.* the property lost was the bribes or the racing days, is compatible with these instructions.

However, the tenets of direct appellate review do not apply in an identical fashion in coram nobis proceedings. Our role is not to reverse these convictions if they are in error, but to overturn them only if justice so compels.[6]

The majority characterizes the government's position in this case as an appeal to this Court to "look beyond the improper instructions to the record to determine if adequate evidence of criminal activity existed on which to base a conviction under post-*McNally* standards." Maj.Op. 1075. They rebuke that position as an attempt to ask this Court "to convict the defendants of crimes with which they were not charged." Nothing could be further from the truth. The government is merely asking us to exercise the appropriate level of review, to examine this case as a whole and determine whether the error committed is of such fundamental nature that justice requires us to overturn these convictions.

### III.

Marvin Mandel, then governor of Maryland, took bribes totalling at least $380,000 to manipulate the workings of state government, which had been entrusted to him by the people of Maryland, to divert extremely valuable racing days to his cohorts. His motive, their motive, was profit—profit proven to be at the expense of the people of the state of Maryland. Although their trial included an erroneous jury instruction, the proceedings were replete with evidence of bribery and manipulation. Their actions were and are patently illegal. My sense of justice does not com-

pel me to set aside these convictions. Therefore, I must respectfully dissent.[7]

---

**6.** Writs of coram nobis have traditionally been reserved for situations where there has been a complete breakdown in the legal system. In *Morgan,* the Supreme Court gave an illustrative list of such breakdowns: insanity of a defendant, a conviction on a coerced guilty plea, failure to advise of the right of counsel, prosecutorial misconduct, a conviction based on perjured testimony. *Id.* at 508–10, 74 S.Ct. at 250–52. In fact, *Morgan* involved a 19–year old man who was not advised of his right to counsel and was convicted without any representation. Certainly, *Travers,* where a man was convicted for

actions that were not illegal, also fits this mold. *Id.* at 511–12, 74 S.Ct. at 252–53. These are the types of errors that justice compels a court to remedy through coram nobis. An erroneous instruction is simply not in this league, especially when there was manifest evidence present of the petitioners' guilt.

**7.** Because I would uphold the mail fraud convictions that are the predicate acts for petitioners' RICO conviction under 18 U.S.C. § 1962, I would affirm the RICO conviction as well.