**UNITED STATES of America, Plaintiff,**

v.

**Joseph B. McCLELLAND, Defendant.**

**No. CR–R–83–16–ECR.**

United States District Court,
D. Nevada.

Dec. 7, 1989.

---

IRS discovery of tax code violations through said monitoring.

On these facts, the detection of these violations and subsequent IRS lawsuits and prosecutions had much more to do with Plaintiff's actions than with Caesars' actions. They were not the "necessary" result of Caesars' furnishing the name, address and social security number of each Ceasars' Palace dealer/employee to the IRS.

Federal courts applying state law should not permit vague and conclusory pleadings to lead them into pronouncing broad principles of state law for which in the pertinent state there exists no controlling authority." *Meiji Mutual Life Insurance Company,* 727 F.2d 1480 (9th Cir. 1984) (The court so reasoned after upholding the dismissal of a civil conspiracy claim). Defendant's motion to dismiss Plaintiff's first and second conspiracy claims for failure to state a cause of action may be granted on the alternative grounds that the complaint fails to allege the requisite elements of a civil conspiracy claim under Nevada law.

Richard Pocker, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff.

N. Patrick Flanagan, Asst. Federal Public Defender, Reno, Nev., for defendant.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

Petitioner McClelland was convicted of attempted interference with commerce by extortion, a violation of 18 U.S.C. § 1951 (1984). On 16 August 1984, he was sentenced to a term of one year and one day, which sentence was fully served by the time petitioner filed his petition for habeas corpus on 14 July 1988 (document # 99).

The relevant facts are not in dispute. In August, 1984, McClelland was convicted for violating provisions of the Hobbs Act, 18 U.S.C. § 1951. Section 1951 provides in pertinent part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

.        .        .        .        .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

At trial, the jury was instructed that the government need not show that McClelland induced an extortion payment. The government was required to prove only "that a public official obtained money to which he was not entitled, and which he obtained only because of his official position." On appeal to the Ninth Circuit, McClelland's conviction was affirmed. *United States v. McClelland,* 731 F.2d 1438 (9th Cir.1984), *cert. denied,* 472 U.S. 1010, 105 S.Ct. 2708, 86 L.Ed.2d 723 (1985). The circuit court affirmed the district court's interpretation of the Hobbs Act in holding that inducement was not an essential element of extortion. *Id.* at 1441.

Four years later, the Ninth Circuit overruled its reasoning in *McClelland* and held that inducement is an essential element to the crime of extortion. *United States v. Aguon,* 851 F.2d 1158 (9th Cir.1988) (*en banc*) (*Aguon II*). Based on this change in the law of the Circuit, petitioner requests this Court to vacate his conviction. He claims that he was found guilty for acts which the law no longer regards as criminal.

In our Order of 31 March 1989 (document # 108), we held that McClelland's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2255 (1971), shall be treated as one for *coram nobis. See* 28 U.S.C. § 1651(a) (1966); *Woykovsky v. United States,* 309 F.2d 381, 384 (9th Cir.1962), *cert. denied,* 374 U.S. 838, 83 S.Ct. 1889, 10 L.Ed.2d 1059 (1963). This is appropriate because petitioner was no longer "in custody" at the time his petition was filed. Furthermore, we relied on *Davis v. United States,* 417 U.S. 333, 346–47, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974), in holding that a change in the law is an appropriate subject of a *coram nobis* proceeding. The

parties were instructed to file briefs presenting specific facts addressed to the propriety of *coram nobis* relief. Specifically, the parties were instructed to present facts from the record that would support or refute an inference that McClelland induced payments. Those briefs having been filed (documents # 109 and 111), we are prepared to rule on petitioner's request for *coram nobis* relief.

■ *Coram nobis* is an "extraordinary remedy," granted only under "circumstances compelling such action to achieve justice." *United States v. Morgan,* 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954). Its purpose is to correct errors of fact that affect the regularity or validity of legal proceedings, and legal errors of a constitutional or fundamental proportion.[1] *United States v. Wickham,* 474 F.Supp. 113, 116 (C.D.Cal.1979). *See also, United States v. McCord,* 509 F.2d 334, 341 (D.C. Cir.1974) (*coram nobis* relief available for "constitutional or jurisdictional errors or serious defects in the trial either not correctable on appeal or where exceptional circumstances justify the failure to appeal on those grounds"), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975). *Coram nobis* should be granted only "to correct errors of the most fundamental character where the circumstances are compelling to achieve justice." *Correa–Negron v. United States,* 473 F.2d 684, 685 (5th Cir.1973), *cert. denied,* 414 U.S. 870, 94 S.Ct. 89, 38 L.Ed.2d 88 (1973). When a criminal judgment is assailed in a *coram nobis* proceeding, the petitioner must overcome a presumption of regularity and correctness in the proceedings. *Morgan,* 346 U.S. at 512, 74 S.Ct. at 253. *See also Ybarra v. United States,* 461 F.2d 1195, 1198–99 (9th Cir.1972).

■ For *coram nobis* relief to lie, the petitioner must show that: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or

---

1. For an excellent discussion regarding the origins of the writ of *coram nobis,* see *United States v. Keane,* 852 F.2d 199 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989).

controversy requirement of Article III; and (4) that the error is of the most fundamental character. *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir.1987).

■ Although petitioner's brief does not address the above criteria, it appears that petitioner has satisfied the first three. First, the more usual writ of habeas corpus is not available to petitioner; since the change in law did not occur until after petitioner had completed his sentence, petitioner does not satisfy the "in custody" requirement for habeas relief. *See Carafas v. LaVallee*, 391 U.S. 234, 238, 88 S.Ct. 1556, 1559, 20 L.Ed.2d 554 (1968); *United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1470 (9th Cir.1988), *cert. denied*, ─ U.S. ─, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). Second, petitioner has valid reasons for not attacking his conviction earlier. Indeed, petitioner did directly appeal his conviction in *McClelland*, 731 F.2d at 1438. Furthermore, petitioner brought this collateral attack only thirteen days after *Aguon II*, which overruled the basis of his conviction, was decided.

■ Third, the "case or controversy" requirement is satisfied, in as much as the Supreme Court has held that "most criminal convictions do in fact entail adverse collateral legal consequences," *Sibron v. New York*, 392 U.S. 40, 55, 88 S.Ct. 1889, 1898, 20 L.Ed.2d 917 (1968), and the government has failed to show that there is

"no possibility" that any collateral legal consequences will be imposed on the basis of the challenged conviction. *Id. See also Hirabayashi*, 828 F.2d at 606; *Chavez v. United States*, 447 F.2d 1373, 1374 (9th Cir.1971). In the Ninth Circuit, there is no need for petitioner to show specific adverse consequences that he presently is suffering or that he is likely to suffer in the future. *See e.g., Byrnes v. United States*, 408 F.2d 599, 601 (9th Cir.1969).

■ The fourth criterion petitioner must show to warrant *coram nobis* relief is that the error is of the most fundamental character, perpetuating a manifest injustice. It is to this issue that the parties address their arguments. The question is whether, in light of the *Aguon II* requirement that inducement is an essential element of extortion, giving the erroneous jury instruction was such a fundamental error to warrant *coram nobis* relief. Put another way, does the record support an inference that McClelland did induce payments, such that his conviction can withstand *coram nobis* attack.[2]

We believe that it does. In *Aguon II*, the Court explained that

> "inducement" can be in the overt form of a "demand," or in a more subtle form such as "custom" or "expectation" such as might have been communicated by the nature of defendant's prior conduct of

2. In *United States v. Mandel*, 862 F.2d 1067 (4th Cir.1988), *cert. denied*, ─ U.S. ─, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989), in granting petitioner's request for *coram nobis* relief after a change in law, the court refused to look behind an erroneous jury instruction to determine whether the record contained adequate evidence of criminal activity to support a conviction. *But see Keane*, 852 F.2d at 204–06. The Fourth Circuit perceived the government's opposition to the *coram nobis* motion as a request for the circuit court to "convict the defendants of crimes with which they were not charged." *Mandel*, 862 F.2d at 1075. This they refused to do. However, we do not read the law of *coram nobis* in the same way.

*Coram nobis* relief should issue only in the presence of some fundamental error. Indeed, the writ of *coram nobis* traditionally is reserved for situations where there is a complete breakdown of the judicial process. *Id.* at 1079 n. 6 (Hall, J., dissenting). Therefore, we cannot set aside McClelland's conviction for a crime with

which he was charged, and of which he was convicted, absent some fundamental error. We have a duty to determine whether such error exists, and find no impropriety in evaluating the record as a whole to aid us in that determination. We agree with Judge Hall, who filed a dissenting opinion in *Mandel. See Mandel*, 862 F.2d at 1076–79 (Hall, J., dissenting). There, in rebuttal to the majority's assertion that the government asked the Court to convict the defendants of crimes with which they were not charged, Judge Hall stated that "[n]othing could be further from the truth. The government is merely asking us to exercise the appropriate level of review, to examine this case as a whole and determine whether the error committed is of such fundamental nature that justice requires us to overturn these convictions." *Id.* at 1079.

The new law enunciating that inducement is an essential element of extortion does not vitiate the strength of McClelland's conviction for extortion, where the record contains adequate evidence of inducement.

his office. Reliance on a system of expecting payments in exchange for public favors can itself be the necessary act of inducement if the public official previously establishes or acquiesces in the system and if the donor is sufficiently aware of the expectation created by prior acts of extortion. Accordingly, the jury instructions must incorporate inducement, which may be explicit or implicit, as a required element of the crime of extortion under the Hobbs Act.

*Aguon II,* 851 F.2d at 1166–67.

■ In the later case of *United States v. Egan,* 860 F.2d 904 (9th Cir.1988), the Ninth Circuit shed more light on the inducement issue. There, the Court held that

> to be guilty of extortion, rather than mere acceptance of a bribe, the public official must do something beyond accepting an unsolicited payment. He must communicate to members of the public that favors are for sale. Such inducement can be a demand, a request, or even a "system of expecting payments in exchange for public favors" established or acquiesced in by the public official.

*Id.* at 907 (citations omitted) (*quoting Aguon II,* 851 F.2d at 1166). Based on these standards for finding inducement, we believe the record supports an inference that McClelland induced a payment of $3,750.00 from undercover agent Rybar.

The record contains transcripts of four face-to-face meetings between McClelland and undercover agent Rybar. During this time, McClelland was an elected member of the City Council of Reno, Nevada. Rybar posed as an out-of-town advisor to a group of doctors interested in building a bank in Reno. Rybar communicated to McClelland that he wanted to anticipate any zoning problems they might encounter, and eliminate those as quickly as possible. McClelland indicated that he was basically pro-development, and cited examples of his support of development in the past. As their relationship developed, the conversations between Rybar and McClelland become more and more open about the type of help Rybar is interested in, and McClelland's willingness to smooth out zoning problems Rybar might encounter. The record is clear, however, that McClelland anticipates favors from Rybar, in exchange for his help. For example, at their second meeting of 16 March 1981 at a private residence at Marla Bay, Nevada, McClelland states that he isn't sure what he wants in return, but that "I'll tell you what I want when I feel I want it.... It may be down the line a ways. I'm not uh, not hungry, not looking for anything right now. Well, uh, don't know what the hell it would be. But then maybe time I'd put in a phone call and I'll need something." McClelland expresses concern that his finances not appear "unusual." He indicates that he does not need anything at the present time, "[b]ut there'll be a time when I uh, when I need something. If I want to make a move politically or if I want to make the move in real estate, and then I'm I may need some help." Later that day, McClelland and Rybar moved their meeting to a restaurant located in the Sahara Hotel, Stateline, Nevada. There, McClelland made additional references to an expectation of future payments from Rybar. He states: "When I've got a problem I'll be right on that g...... phone.... It's usually right there in front of you. I say, I've got this problem, how you gonna solve it? And uh you better use some, you know, you better start doing your tap dance or some g...... thing to get that, to get that problem taken care of."

At this third meeting, McClelland also discusses his influence with the Regional Planning Commission. He tells Rybar to "tell me exactly what you want, where you want it," and then McClelland will "feel out a couple of our guys on the RPC." McClelland says that there are no problems with the Regional Planning Commission, "because anything they do, we overturn." If there should be a delay at the RPC level, McClelland urges Rybar to "call immediately and what I do is make a few phone calls to her say 'get your ass in gear, this is not the way to treat this individual and we don't like that.' And all of a sudden there's little bit faster movement people." McClelland contrasts this procedure with that of the "poor schmuck that comes in

off the street," who "has to sit there and play the game the way they want it done and ... I would just chaffe (sic) under that process...." McClelland states that the people at the RPC are "not worth doing anything for," and that if there is some problem, McClelland will "make the appropriate call and all of a sudden the problem no longer exists."

McClelland then explains that the next step to getting zoning approval after the RPC is the Reno City Council. McClelland sets forth a strategy for getting the desired zoning changes through the City Council. He directs Rybar to let him know when all the financial principles are prepared to go forward, and then:

> let's spend some time, sit down, no booze, straight business and it (U) okay, what'd you, what'd you gonna do ah, where you're gonna do it, how fast you wanna do it, just you know, lay it out to me. And I'll try to counsel you and ah, lay it, lay out what I know where we have to go, and that sort of stuff.
>
> Rybar: Okay.
>
> McClelland: And save you some time.
>
> Rybar: Yeah.
>
> McClelland: Um, a lot of it that I don't know there's a lot of it I do know, especially when personalities come, how to get around this and then I can make some phone calls and see that things are fairly well taken care of, and then ah, Christ sakes, don't try to grease anybody unless I tell you.

Later in the conversation, McClelland states that "a point is fine" for his fee on the transaction. To Rybar's statement, "That's fine for me. A point on the gross," McClelland responds, "Uh huh. Yeah." McClelland later relates that

> "I don't even know what, you know, what kind of numbers you're dealing with, but a point is generally an accepted amount. An accepted fee. (U) I've gone for less on greater amounts.
>
> Rybar: Yeah, true.
>
> McClelland: Talk about offshore, I've been involved, I used to work for a firm that dealt in uh, offshore weapons. Alright, and you deal in amounts there

when half point means a great deal of money.

> Rybar: Right.
>
> McClelland: I didn't have any problem with that either. A point doesn't make me a hog. It cements the relationship.

Toward the end of their fourth face-to-face meeting, at the Ormsby House in Carson City, Nevada, McClelland indicates that he wants to be very careful about the method of payment. He says, "anything that you do, that any money that you propose will have absolutely nothing to do with this. We will form a business alliance and that's the way I'll (U)." He explains that he has a consulting service, called "Associated Consultants. We do political consulting and we do, uh, uh, we've done a little land use stuff." McClelland goes on to instruct Rybar to "run it [the payment] in there [Associated Consultants], that's good, that is the way I prefer it because that way it's a business ... transaction."

At the end of the fourth meeting, Rybar produced an envelope filled with cash, which McClelland declined. Instead, he requested that Rybar make out a check for $3,750.00 to Associated Consultants, as had been discussed previously. McClelland took the check, but returned it later on the advice of counsel.

Based on the foregoing, it is clear that McClelland's words and actions illustrate a subtle form of inducement, as stated in *Aguon II* and *Egan*. McClelland communicated to Agent Rybar that favors were for sale by his discussions regarding "fees" for his services, methods of payment, and his vocalized intention to call Rybar when he needed something in the future.

If petitioner had been tried for the same offense today, under these same circumstances, 18 U.S.C. § 1951 would not sustain his conviction on appeal. However, the law of inducement was not so clear at the time of petitioner's conviction and appeal. The jury instructions were consistent with the law of the circuit at that time. Petitioner's legal contention was raised and decided adversely to him on the full record, after an opportunity to ventilate all arguments. In addition, the Ninth Circuit's ruling in

*Aguon II* did not rest on any constitutionally-based analysis, but rather, rested upon its interpretation and construction of 18 U.S.C. § 1951. *See Aguon II*, 851 F.2d at 1162–67. Thus, the trial court's error in failing to instruct that the government must prove inducement is "not fundamental, as it does not—and did not—affect the proceedings in such a manner as to cause serious injustice." *Wickham*, 474 F.Supp. at 116.

This is not a case like *Davis*, 417 U.S. at 333, 94 S.Ct. at 2298 or *United States v. Travers*, 514 F.2d 1171 (2nd Cir.1974), where the change in law transformed defendant's conduct from criminal to benign. Rather, the indictment under which McClelland was convicted continues to state an offense. *See United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989). The record reveals that the *Aguon II/Egan* tests for inducement are satisfied by McClelland's actions. "An error in the jury instructions—when a valid conviction could have been had under different instructions on at least one count of this [ ] indictment—is not the sort of fundamental defect that produces a complete miscarriage of justice." *Keane*, 852 F.2d at 205.

In their recent case of *United States v. Bush*, 888 F.2d 1145 (7th Cir.1989), the Seventh Circuit revisited their *Keane* opinion. *See Keane*, 852 F.2d at 199. The court cogently summarized the conflict and balance that must be maintained between finality and correctness of judgements:

> Any system of justice requires a compromise between finality and accuracy. Although in the best of all worlds every judgment would be subject to correction as new facts came to light and legal principles were refined, in a costly legal system correction is a luxury. Judicial time devoted to reexamining the decisions of 1975 subtracts from the time available to deal with the festering grievances of 1989. Belated efforts to correct judgments can reduce accuracy as well as increase it.... Witnesses have died; memories have failed and documents vanished. A retrial in 1990 on events of 1973—even if that would be a sensible

allocation of judicial and prosecutorial time in light of other pending disputes— would be much less reliable on questions of fact even if more reliable on questions of law. These and other considerations support the doctrines of finality that pervade the legal system.

We are well aware of the tension between finality and accuracy, and we concur with the Seventh Circuit's sense of balance because the writ of *coram nobis* demands it. Because petitioner's assigned error is not sufficiently fundamental to warrant relief in *coram nobis,*

IT IS, THEREFORE, HEREBY ORDERED that McClelland's petition for a writ in the nature of *coram nobis* (document # 99) is DENIED.